1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WAYNE DESHOWN PERKINS,** | **Case No. 1:13-cv-01205 LJO MJS (HC)** |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| **P.D. BRAZELTON, Warden,** | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Christina H. Simpson of the office of the Attorney General.

I.     PROCEDURAL BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on March 15, 2010, for first degree murder, possession of a firearm by a felon, attempt to prevent or dissuade a witness, and various enhancements. (Clerk's Tr. at 2384-85.)   Petitioner was sentenced to an indeterminate term of life without the possibility of parole for murder consecutive to a term of seven (7) years to life in state prison for attempting to dissuade a witness.  (Id.)

1

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, which affirmed the judgment on May 18, 2012.  (Lodged Docs. 4-6, People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 (May 18, 2012).) On August 8, 2012, the California Supreme Court denied review. (Lodged Docs. 7-8.) Petitioner did not seek collateral review of the conviction in state court.

Petitioner filed the instant federal habeas petition on August 2, 2013.  (Pet., ECF No. 1.) Petitioner presents seven claims for relief in the instant petition. Petitioner alleges: (1) that the trial court coerced a verdict from the jury by requiring them to continue to deliberate and placing undue pressure on the holdout juror; (2) that his right to an open and public trial was violated by the court instructing the public to remain in the courtroom until after the jurors had left the building; (3) that the jury was provided overly prejudicial evidence regarding a previous shooting incident in which Petitioner was involved; (4) that he suffered ineffective assistance of counsel when trial counsel failed to request to redact portions of recorded statement Petitioner made to law enforcement; (5) that the prosecutor failed to present corroborating evidence of an accomplice, as required by state law; (6) that the trial court erred by denying his motion to bifurcate the trial with regard to the gang enhancements; and (7) that Petitioner was denied his right to be present at all critical stages of trial when he was denied his request to be personally present for read back of testimony to the jury during deliberations. (Id.) Respondent filed an answer to the petition on November 6, 2013. (ECF No. 12.) Petitioner filed a traverse on November 20, 2013. (ECF No. 13.) The matter stands ready for adjudication.

## II.   STATEMENT OF THE FACTS[1]

### INTRODUCTION

On the night of February 13, 2007, Deondre McGruder was shot and killed. Appellants Wayne Deshown Perkins and Anthony Jones were

---

[1] The Fifth District Court of Appeal's summary of the facts in its May 18, 2012 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

charged with McGruder's murder. After a mistrial in 2008, they were re-tried in 2010. A jury convicted Perkins and Jones of first degree murder (Pen. Code,[fn1] § 187, subd. (a); count 1), with a gang special circumstance (§ 190.2, subd. (a)(22)), a gang enhancement (§ 186.22, subd. (b)(1)), and firearm enhancements (§ 12022.53, subds. (d), (e)(1)). The jury also convicted Perkins of possession of a firearm by a felon (§ 12021, subd. (a)(1); count 2) and attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2); count 3), with a gang enhancement (§ 186.22, subd. (b)(1).) Perkins and Jones were sentenced to life in prison without the possibility of parole (LWOP) for the crime of first degree murder with the gang special circumstance. Perkins was also sentenced to a consecutive term of seven years to life for the crime of attempting to dissuade a witness and the associated gang enhancement.

**FN1**: Further statutory references are to the Penal Code unless otherwise specified.

…

FACTS[fn3]

**FN3**: In our summary of the facts, we do not include every single detail the parties have recounted in their extensive factual summaries, but we do include all the facts relevant to the issues raised on appeal and necessary to an understanding of the central events in the case. Relevant facts not included in our factual summary will be set forth as necessary in our discussion of appellate issues.

I. The Prosecution

    A. The Shooting

Around 9:15 p.m. on February 13, 2007, gunshots were heard by residents of a house on Snapdragon Lane in Bakersfield. The residents described hearing two sets of gunshots, comprised of one or two gunshots followed by a brief pause and then a number of gunshots in quick succession. When the residents looked through their kitchen window, they saw the victim, later identified as Deondre McGruder, lying in the front yard. McGruder, who sustained multiple gunshot wounds, died from massive bleeding caused by a gunshot wound to the chest.

A criminalist examined eight spent cartridge casings found at the scene and expressed the opinion that all eight were fired from the same firearm. The firearm was a .40-caliber Glock semiautomatic pistol, either the Glock Model 22 or the Glock Model 23.[fn4] Police investigators also recovered one live round from the scene, but it was of a different caliber than that of the eight spent cartridge casings. Investigators found a piece of copper jacketing and a copper jacketed projectile at the scene, and another projectile was collected from the autopsy.

**FN4**: The murder weapon was never found.

    B. Torino Jackson (Accomplice Testimony)

Torino Jackson attributed the shooting to appellants. Jackson testified that sometime during the afternoon on February 13, 2007, Perkins

3

came to his house. Jones joined them later and they all hung out together on Jackson's front porch.

After it got dark, Jackson's friend, Nyesha Hendrix, came to the house and drove Jackson and appellants back to her apartment. Eventually, the three men left the apartment and got into Hendrix's red, two-door Ford Escort and started driving around. Perkins was the driver, Jones sat in the front passenger's seat, and Jackson sat in the backseat. While they were driving around, Jackson was busy texting on his cell phone.

Perkins eventually stopped the car on a residential street and got out with Jones, while Jackson stayed in the car. Jackson saw appellants walk towards a house close to where they parked. A few minutes later, appellants returned to the car and they started driving again.

Soon after they started driving again, Jackson saw McGruder walking down the street. McGruder appeared to be talking to someone in another car. Jackson testified that, as they drove by McGruder, Perkins asked him, "Watts up?" McGruder replied, "All day, every day." In a prior police interview, Jackson said McGruder addressed them first, asking "Watts up?" Perkins responded by asking the same question. McGruder then said "[a]ll day, every day" and yelled "South" as appellants' car passed by him.

Jackson testified that after this verbal exchange with McGruder, Perkins drove into a cul-de-sac and turned around. Perkins then stopped the car near where McGruder was walking and turned off the engine and lights on the car. Appellants both got out of the car, while Jackson remained in the back seat. Jones donned a ski mask, pulling it down so it covered his whole face.

Jackson saw appellants start walking towards McGruder. He was not paying close attention, however, because he was still on his phone. Suddenly, Jackson heard gunshots and ducked down. He then peeked out and saw Perkins pointing a gun at McGruder. Jackson heard two sets of gunshots that night.

When the gunshots ended, appellants returned to the car. As they were driving away, Jackson observed a silver gun on Jones's lap. On direct examination, Jackson testified that there was no conversation during the drive back to Hendrix's apartment, which took five to seven minutes. However, on cross-examination, Jackson testified that he remembered Jones saying that his gun had jammed.

Jackson acknowledged that he knew a person named James Beale, who had been shot and killed in February 2007. Jackson claimed he could not recall appellants discussing Beale on the drive back to Hendrix's apartment. He only recalled that they had discussed the subject earlier that day at his house, talking about how "messed up" it was that someone had killed Beale. However, during a prior police interview, Jackson said the shooting "probably was a retaliation," and reported that, during the drive back to Hendrix's apartment after the shooting, appellants were talking about what "a cool person" Beale had been and how they had known him for a long time.

4

Jackson testified that when they got back to Hendrix's apartment, Hendrix opened the door and appellants went inside. Jackson claimed he stayed outside and called his sister. Eventually, two girls he knew from high school arrived at the apartment complex and gave him and appellants a ride home.

Jackson testified that the morning after the shooting, Hendrix texted him and then took him to breakfast at Denny's. After breakfast, Hendrix returned Perkins's gun to Jackson. Jackson hid the gun inside his house until Perkins came and got it from him on February 15, 2007.

### C. Nyesha Hendrix

Hendrix testified that on February 13, 2007, she drove to Jackson's house around 8:00 p.m. She then drove Jackson and appellants back to her apartment, so she could get her wallet. When she was in her bedroom getting her wallet, Perkins came in and asked her if he could borrow her car. Hendrix was reluctant at first because Perkins had borrowed her car in the past and returned it late. She finally agreed to let him borrow the car after he promised to return it by 9:40 p.m. After Hendrix gave Perkins the keys to her car, he left the apartment together with Jones and Jackson. Hendrix did not know where they were going.

Sometime after she had gone to bed, Hendrix got a call from Jackson, asking her to open the front door to her apartment. Hendrix looked at her clock, which showed it was 9:42 p.m. Hendrix got out of bed and opened the front door. Appellants and Jackson were standing there. According to Hendrix, all three men, including Jackson, came into the apartment and Hendrix went back into her bedroom.

After the three men came into Hendrix's apartment, Jackson went back into the bathroom in Hendrix's bedroom, while Perkins and Jones stayed in the living room. Perkins used Hendrix's house phone to call Tasha Lelfore, whom Hendrix knew from school.

When Jackson came out of the bathroom, he sat on the edge of Hendrix's bed but did not say anything about the shooting. Eventually, Jackson left and Hendrix stayed in her bedroom. When she was in her bedroom, one of the three men told her to come lock the front door because they were leaving. Hendrix got up, locked the door, and then went back to bed.

Hendrix woke up early the next morning and started cleaning her apartment. While she was cleaning, she found a black gun and a ski mask under the couch. Hendrix recalled that the gun had "Glock .40" printed on it. She had never seen a gun before in her house.

Hendrix placed the gun and ski mask in a backpack. She then called Jackson and asked him why there was a gun in her house. Jackson told her that Perkins had left it there.

After putting the backpack in her car, Hendrix drove to Jackson's house. Jackson came outside, took the gun and ski mask from Hendrix, and carried the items back into his house, hiding the gun under his shirt. Jackson then returned to Hendrix's car and they went to Denny's.

Later that day, Hendrix took her car to her grandmother's house, washed it, and left it there with a tarp over it.[fn5]

**FN5**: A crime lab technician later processed the interior and exterior of Hendrix's car and lifted five usable prints which matched Jackson's fingerprints. All five prints were located on the exterior of the car's passenger side door and window. The crime lab technician found no usable prints matching either Perkins's or Jones's fingerprints.

In the past, Hendrix had heard Perkins say he was from Grape Street which she took to mean "he was involved with the gang Grape Street."

On cross-examination, Hendrix testified it was a total surprise to her to find the gun under the couch. She did not recall any of the three men saying anything about leaving a gun when they left her apartment. However, in a prior police interview, Hendrix reported that, as Perkins was leaving her apartment, he asked her to take his gun to his uncle's house. Hendrix told police she did not think anything of it at the time because she was half asleep. But the next morning when she was picking things up, she saw something black sticking up from under the couch, grabbed it, and realized it was the gun Perkins had mentioned.

Hendrix also testified on cross-examination that, when she went to Denny's with Jackson the day after the shooting, Jackson told her that Jones "shot the guy twice and the gun jammed." Jackson also said something to the effect that McGruder got what he deserved because he killed Beale. Hendrix specifically recalled Jackson saying, "That's what he get because he shouldn't have killed James like that."

### D. Tasha and Tasia Lelfore (Witnesses of Events After Shooting)

Sisters Tasha and Tasia Lelfore confirmed that on the evening of February 13, 2007, Perkins called to ask for a ride, and that they drove to apartments near the Wilson library and saw Jackson and appellants standing outside. Because there was not enough room in the car for all three men, Tasia dropped Tasha off and then returned to give Jackson and appellants a ride home. At trial, Tasia estimated that she started dropping the three men off at home around 9:00 p.m. However, she previously told a police detective it was closer to 10:00 p.m. when she started dropping them off.

Tasha testified that Perkins later called her at work and told her that she did not pick him up on February 13. She got the impression that he was trying to get her to testify that she picked him up on some other date. Tasha was certain that she and her sister picked appellants up at the apartments on February 13, 2007, because it was her friend's birthday and they were having a party that night. When Perkins called Tasha, he also asked for Tasia's phone number, which Tasha gave to him.

A recording of the call Perkins made to Tasha, which Perkins placed from jail, was played to the jury and admitted into evidence against Perkins only. The recording reflects that Perkins also tried to call Tasia, but his call went to her voicemail.

E. <u>Travon Stewart, Leann Newman, and Paul Evans (Witnesses of Events Prior to Shooting)</u>

On the night of February 13, 2007, two witnesses, Travon Stewart and Leann Newman, saw McGruder walking in a residential street near where the shooting occurred. They also both saw a red car in the vicinity. Stewart later identified Hendrix's red Ford Escort to police as the car he saw that night.

Newman specifically testified that, although they were no longer together, she had lived with McGruder for seven years and had a young child with him. Newman explained that when she saw McGruder on the night of the shooting, she was on her way to drop off their child at McGruder's mother's house to visit his father. Stewart was driving the car Newman and the child were in when she saw McGruder.

When Newman first saw McGruder, he was walking in the direction of his mother's house. The street he was walking on was near Snapdragon Lane and the street where a Foods Co. store was located. As they drove past McGruder, he looked at the car and gestured towards Newman with his hands. They kept driving and dropped the child off at McGruder's mother's house.

After dropping the child off, Newman saw McGruder again. He was still walking towards his mother's house and appeared to have just crossed back from talking to someone in a red car.

Stewart testified that when they first drove past McGruder, he appeared to be trying to flag down their car. Stewart kept driving and did not see McGruder again after they dropped off the child. As they were driving away from the house, Stewart saw Hendrix's red Ford Escort parked by a curb. Stewart saw one person in the car, sitting in the driver's seat.

Paul Evans testified that in February 2007, he lived near the Foods Co. in the neighborhood where the shooting occurred. Evans knew appellants and Jackson. Evans described Jackson as a close family friend. Evans was also friends with Jones, and considered himself to be a closer friend to Jones than to Jackson. Perkins, on the other hand, was "[n]ot a close friend but associate."

After the shooting, police officers came to Evans' house and informed him that Jones had been taken into custody on February 15, 2007. Evans told the police that Jones had stopped by his house a couple of days before Jones was taken into custody. Jones had stopped by twice, once in the afternoon and once in the evening.

Evans initially testified that when Jones came over to his house in the evening, it was sometime between 7:00 p.m. and 7:30 p.m. However, he later acknowledged telling police that Jones came over around 8:00 p.m. He also told police Jones could not have come over around 9:00 p.m. or 9:30 p.m. because Evans had left his house around that time.

In addition, Evans told police that, after Jones left his house that night, he too left and came back later. When Evans came back to his house, he started ironing his clothes for school. While he was ironing his

clothes, a girl he knew called and told him that somebody had just gotten shot and asked him if he was okay.

Evans further testified that he saw Jackson at a McDonald's restaurant on February 21, 2007, and that Jackson asked him if he knew anyone who wanted to buy a Glock gun. Evans did not actually see the gun but could see the outline of a gun under Jackson's T-shirt. Jackson told Evans the gun "had a body on it."

The first time Evans ever told anyone about his conversation with Jackson about the gun was to a defense investigator in January 2010; Evans did not report the conversation to police investigators who questioned him about the shooting in 2007. The defense investigator, Victor Lostaunau, testified that Evans did not mention seeing the outline of a gun under Jackson's T-shirt but instead reported that he did not see the gun Jackson told him about.

## F. Gang Evidence

The parties stipulated that the Eastside Crips is a criminal street gang in Kern County, as the term "criminal street gang" is defined under section 186.22. Bakersfield Police Officer Kyle Ursery testified as a gang expert and opined that appellants were active members of the Eastside Crips and that Jackson was an affiliate or associate of the gang. Ursery further opined that McGruder was affiliated with the Country Boy Crips, and testified that a longstanding rivalry existed between the East Side Crips and the Country Boy Crips. Presented with a hypothetical shooting based on the facts of this case, Ursery expressed the opinion "[t]hat it would, in fact, be in benefit of, at the direction of, and in furtherance of that particular gang."

Bakersfield Police Sergeant Greg Jehle also testified as a gang expert and opined that Evans was an active member of the Eastside Crips gang. Jehle was of the opinion that, if an active member of the Eastside Crips criminal street gang testified in a case involving two defendants that were alleged members of the same gang, the testimony would benefit both the gang and the member that testified.

## G. Evidence Against Perkins Only (Dissuading a Witness Charge)

Hendrix testified that she was arrested and charged with being an accessory to murder. Following her arraignment, she was transported in the same elevator with Perkins. She heard Perkins say she needed to be scared for her family and that "his boy T" was coming after them. Hendrix knew he was referring to a person named Terry. The elevator incident occurred shortly after Hendrix's father had called the police to report that someone was calling and making threats against Hendrix's family. Hendrix considered Perkins's comments in the elevator to be a threat and she felt scared.

Valentina Branda, another inmate who was in the elevator with Hendrix and Perkins, testified Perkins leaned forward between Hendrix and Branda and said two times, "Don't trip. The boys are coming." Hendrix started crying, which led Branda to believe Hendrix was scared.

Branda further testified that she heard Perkins make the same

comment ("The boys are coming") under his breath in the courtroom during the arraignment preceding the elevator ride.

II. <u>Perkins's Defense</u>

The defense presented evidence to show Jackson was the one who placed a threatening phone call received by Hendrix's father, Keith Hollins, on February 24, 2007. Specifically, Hollins testified the phone rang around 11:00 p.m., and a male caller asked "is Nyesha there." Hollins asked who was speaking. The caller replied, "Reno" (Jackson's moniker). Hollins told him it was late and that they did not get calls that late. The caller replied that he knew she was there and that she "snitched" on his "homie." Hollins told the caller he did not know what he was referring to. The caller replied, "yeah, you know what's going on," and "she owe me some money." Hollins further testified: "[A]fter he said, yeah, she is there, he said, yeah, and we are going to have to pull one. And I can hear voices in the background on the phone saying yeah, yeah, something like that. Then he proceeded to tell me exactly where we lived." When Hollins asked the caller how he knew where he lived, the caller said to look out the window. Hollins did not look outside. After hanging up the phone, Hollins directed his family members to lie down on the floor and dialed 911.

Bakersfield Police Officer Scott Drewry responded to Hollins' residence 15 to 20 minutes later. Drewry testified that Hollins told him that Jackson, whose voice he recognized, had called and requested to speak with Hendrix. When Hollins refused, Jackson began to threaten Hollins, saying he was going to shoot Hendrix for speaking with the police regarding their investigation and that he was going to kill all the family members.

When speaking with Drewry, Hollins referred to Jackson by his first name (Torino) and said he knew Jackson and that Jackson had come to his residence on a number of occasions with Hendrix. Hollins did not mention hearing other voices in the background or Jackson saying anything about "homies" during the phone call.

Drewry also spoke with Hendrix, who told him that she thought Jackson was involved in the murder on Snapdragon Lane and believed that Jackson thought she was speaking with police regarding their investigation of the murder. Hollins and Hendrix both sounded like they were being truthful.

The defense also presented evidence that Hendrix initially reported to police that Jackson borrowed her car on the night of the shooting. Bakersfield Police Detective Dennis West testified he interviewed Hendrix on February 25, 2007. During the interview, she said she picked Jackson up at his house and drove him back to her apartment. She also said she loaned her car to Jackson. She said she gave him the keys and he left driving the car. Initially, she said Jackson borrowed her car around 9:20 p.m. (the reporting time of the Snapdragon homicide was around 9:24 p.m.). However, in a later interview, Hendrix said he actually borrowed her car around 9:00 p.m., and she had lied in her first interview because she was scared.

West also interviewed Jackson on February 25, 2007. Jackson

1
2
3

initially reported that Hendrix stopped by his house but claimed he did not leave with her and was at his house the whole day. Later, Jackson admitted he went to Hendrix's apartment and said he went to get money for shoes. Jackson reported that when he went inside her apartment, Perkins came out of the bedroom and then he and Perkins both left.

4
5

Jackson initially denied taking possession of a gun from Hendrix. Eventually, he admitted he received a gun from Hendrix and put it under his couch.

6
7
8
9

West also testified that the distance between Hendrix's apartment complex, which was located on Freemont Street off of Wilson and South H Streets, and the address on Snapdragon Lane where the shooting occurred, was about a mile and a half, and was a three to 15 minute drive, depending on traffic. There was a mixture of residential and commercial areas between Hendrix's residence and the Snapdragon Lane location. The distance between Jackson's residence on Monitor Street and the Snapdragon Lane location was roughly two miles.

10

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735, 1-21 (May 18, 2012).

11

**III.** **DISCUSSION**

12

**A.** **Jurisdiction**

13

Relief by way of a petition for writ of habeas corpus extends to a person in

14

custody pursuant to the judgment of a state court if the custody is in violation of the

15

Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. §

16

2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he

17

suffered violations of his rights as guaranteed by the U.S. Constitution. (Pet.) In

18

addition, the conviction challenged arises out of the Kern County Superior Court, which

19

is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly,

20

this Court has jurisdiction over the instant action.

21

**B.** **Legal Standard of Review**

22

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

23

Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

24

filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

25

114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment

26

of the AEDPA and is therefore governed by AEDPA provisions.

27

Under AEDPA, a person in custody under a judgment of a state court may only be

28

granted a writ of habeas corpus for violations of the Constitution or laws of the United

States.  28 U.S.C. § 2254(a); <u>Williams</u>, 529 U.S. at 375 n. 7.  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.   Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that [are] materially indistinguishable from [a Supreme Court case] but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-06).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner." <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u> at 75-76 (quoting <u>Williams</u>, 529 U.S. at 409-10); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002).  In <u>Harrington v. Richter</u>, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

1    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

2    correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

3    U.S. 653, 664 (2004)).   Further, "[t]he more general the rule, the more leeway courts

4    have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

5    Ct. 1855, 1864 (2010).   "It is not an unreasonable application of clearly established

6    Federal law for a state court to decline to apply a specific legal rule that has not been

7    squarely established by this Court."   Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

8    (2009) (quoted by Richter, 131 S. Ct. at 786).

9                     2.     Review of State Decisions

10        "Where there has been one reasoned state judgment rejecting a federal claim,

11   later unexplained orders upholding that judgment or rejecting the claim rest on the same

12   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

13   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

14   (9th Cir. 2006).    Determining whether a state court's decision resulted from an

15   unreasonable legal or factual conclusion, "does not require that there be an opinion from

16   the state court explaining the state court's reasoning."   Richter, 131 S. Ct. at 784-85.

17   "Where a state court's decision is unaccompanied by an explanation, the habeas

18   petitioner's burden still must be met by showing there was no reasonable basis for the

19   state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does

20   not require a state court to give reasons before its decision can be deemed to have been

21   'adjudicated on the merits.'"  Id.

22        Richter instructs that whether the state court decision is reasoned and explained,

23   or merely a summary denial, the approach to evaluating unreasonableness under §

24   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

25   or theories supported or, as here, could have supported, the state court's decision; then

26   it must ask whether it is possible fairminded jurists could disagree that those arguments

27   or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

28   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

1  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

2  authority to issue the writ in cases where there is *no possibility* fairminded jurists could

3  disagree that the state court's decision conflicts with this Court's precedents."  Id.

4  (emphasis added).  To put it yet another way:

5
6  As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
7

8  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

9  are the principal forum for asserting constitutional challenges to state convictions."  Id. at

10  787.  It follows from this consideration that § 2254(d) "complements the exhaustion

11  requirement and the doctrine of procedural bar to ensure that state proceedings are the

12  central process, not just a preliminary step for later federal habeas proceedings."  Id.

13  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

14         3.    Prejudicial Impact of Constitutional Error

15  The prejudicial impact of any constitutional error is assessed by asking whether

16  the error had "a substantial and injurious effect or influence in determining the jury's

17  verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

18  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

19  state court recognized the error and reviewed it for harmlessness).  Some constitutional

20  errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

21  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

22  (1984).

23  **IV.**    **REVIEW OF PETITION**

24      **A.**    **Claim One: Unlawful Coersion of the Jury**

25  Petitioner claims that the trial court's comments to the jury created undue

26  coercion, especially with respect to the holdout juror. (Pet. at 6.)

27         1.    State Court Decision

28  The claim was denied in a reasoned decision by the Court of Appeal (People v.

1    Perkins, 2012 Cal. App. Unpub. LEXIS 3735) and in a subsequent petition for review

2    filed with California Supreme Court. (Lodged Docs. 7-8.) "[W]here there has been one

3    reasoned state judgment rejecting a federal claim, later unexplained orders upholding

4    that judgment or rejecting the claim rest on the same grounds." See Ylst v.

5    Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through"

6    presumption. Id. at 804. Since the Court of Appeal was the last court to issue a

7    reasoned opinion on this issue, this Court "looks through" the California Supreme Court

8    decision to the reasoned analysis of the Court of Appeal. In the last reasoned decision

9    denying Petitioner's claim, the appellate court explained:

10   B. The Trial Court Did Not Coerce the Jury Into Returning a Verdict

11       1. Factual Background

12       Appellants' jury trial commenced on January 28, 2010. There was a
     one-week break during the trial, where the jury was in recess, starting on
13   the afternoon of February 19, and ending on the morning of March 1,
     2010. The jury began its deliberations on the afternoon of Monday, March
14   8, 2010. On the fourth day of deliberations (Thursday, March 11, 2010), at
     1:40 p.m., the jury sent a note advising the trial court: "We are at an
15   impasse, 11 to 1 on all charges except Count 3 on Perkins. On that
     charge we are all in agreement."
16
         The trial court conferred with the attorneys and expressed its
17   intention to instruct the jury pursuant to California Rules of Court, Rule
     2.1036 (Rule 2.1036).[fn13] The defense attorneys objected to giving this
18   instruction, arguing it would be coercive in light of the jury's revelation of
     an 11-to-1 vote. Jones's counsel also observed that the jury's revelation
19   violated "the instruction that the Court gave the jury ... that they were not
     to give numbers as to splits unless they were instructed by your Honor." In
20   lieu of the court's proposed instruction, Perkins's counsel requested that,
     "we just bring the jurors out; ask them if it's, in fact, 11 to one; if there is
21   anything they feel the Court could do that would assist them in their
     deliberations. If the answer is no, ... inquire... if they are, in fact,
22   deadlocked ... and at that point just declare a mistrial."

23   FN13: Rule 2.1036 provides: "(a) ...After a jury reports that it has reached
     an impasse in its deliberations, the trial judge may, in the presence of
24   counsel, advise the jury of its duty to decide the case based on the
     evidence while keeping an open mind and talking about the evidence with
25   each other. The judge should ask the jury if it has specific concerns which,
     if resolved, might assist the jury in reaching a verdict. [¶] (b) Possible
26   further action. [¶] If the trial judge determines that further action might
     assist the jury in reaching a verdict, the judge may: [¶] (1) Give additional
27   instructions; [¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to
     make additional closing arguments; or [¶] (4) Employ any combination of
28   these measures."

After overruling the defense objections, the trial court made the following observations:

"The Court, in [People v. Young (2007) 156 Cal.App.4th 1165 at page 1171], noted that the trial Court has the discretion to ascertain whether there is a reasonable probability a jury deadlock might be broken. When the Court is faced with a deadlocked jury, it must proceed carefully lest its actions be viewed as coercive. At the same time, when faced with questions from the jury, including that they have reached an impasse, a Court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.

"This Court's aware of its duty not to make any remarks that could be viewed as coercive to the jurors. This Court is not going to urge the jurors to reach agreement. I am not going to give the jury any coercive instructions. I am not going to make any remarks that show the Court has a preference for a particular verdict. And I am going to proceed as indicated."

When the jury was brought back into the courtroom, the trial court read the jury's note and ascertained that it still reflected the status of its deliberations. The court then instructed the jury as follows:

"THE COURT: All right. The first thing I will do? I'm not saying that you are in trouble. But I will point out again to you the instruction that has number 17.47, which you can look at when you go back in the jury room. And 17.47 directs the jurors not to disclose to anyone outside the jury, not even to me or any member of my staff, either orally or in writing, how you may be divided numerically in your balloting as at to any issue unless I specifically direct otherwise.

"The purpose of that instruction is the Court has certain procedures that it follows if I am informed the jury is at an impasse. And we don't want the jurors sending  [*69] out notes saying here's our breakdown on the following counts.

"So from this point on, if there's an impasse just inform me of the impasse. And then I will follow the procedures that the trial Courts use in determining what information I need based on that.

"Does that make sense?

"THE FOREPERSON: Yes, it does. Yes, your Honor.

"THE COURT: Thank you. [¶] ... [¶]

"Here's what I'm going to do: The Rules of Court which guide trial Judges in conducting jury trials directs a Court that if a jury reports that it has reached an impasse in its deliberations the trial Judge may, in the presence of counsel, advise the jury of its duty to decide the case, if you can do

15

so, based on the evidence while keeping an open mind and talking about the evidence with each other. It also directs the Judge that the Judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict. [¶] ... [¶]

"And then the Judge is also to suggest further action that the Judge might offer that might assist the jury in reaching a verdict. And that possible further action includes the following: That could include further readback of testimony....

"Also, the Court could give additional instructions on the law. The Court could also clarify previous instructions already given to you on the law.....

"The Court could also permit the attorneys to make additional closing arguments.... [¶] ... [¶]

"So that's something I am also going to invite you to discuss among yourselves to see if there is anything that you would like the Court to do in that regard.

"And then the Court can obviously employ any combination of those different things I suggested. You are not limited to any one of them. You can ask for several different types of assistance.

"So let me also make it very clear that the Court is not in any way indicating that I have any preference as to any verdict that the jury may reach. I am not trying to coerce you in any way to reach a verdict. All I am trying to do is to say is there anything I can do to assist the jury in reaching a verdict. So that's the purpose of my comments to you. It's just to invite you to consider among yourselves if there is anything the Court can do to assist the jury in reaching a verdict, if you can do so. And this is not, in any way, meant to be coercive or to put undue pressure on anyone.

"So what I am going to ask you all 12 to do is to go back into the jury room. Discuss among yourselves the comments and suggestions that I have made. And then if there is something that the Court might do to assist the jury, send me a note. But don't give me any more breakdowns on the ballot. It may come to a point where I will ask for that, but you need to wait until I ask for that."

When the jury resumed its deliberations, Perkins's counsel made a motion for a mistrial, in which Jones's counsel joined, arguing the "net effect" of the trial court's instructions was to place "undue pressure on [the holdout] juror to change their vote to reach a verdict." The court denied the motion for mistrial, reasoning, in part:

"So when [Rule 2.1036] says I advise the jury of its duty to decide the case, I add the words 'if you can do so' which I think makes it even more clear that the Court is not being coercive. If they can decide the case, that's fine. If they can't,

that's fine too."

The same day, at 3:08 p.m., the jury sent the trial court a second note, which read as follows: "We are still at an impasse, and we have an ill juror who would like to be excused." The court then stated:

"My proposed response to this note is to bring out all 12 jurors. Read the note in the presence of the jurors. Confirm with the foreperson that the note is correct. Then identify which juror he is referring to.

"At that point, if it's confirmed that is a juror who is ill who would like to be excused, I will ask the other 11 jurors to go back into the jury room, instruct them not to deliberate while they are back there since they don't have 12 jurors, and then the Court intends to address the juror who may be ill and may want to be excused. I will address that subject just the way I would in any case. And then we will have a sidebar. And I will certainly consider offering counsel an opportunity to also examine the juror who may be identified as being ill."

Perkins's counsel objected to the court's proposed response and this colloquy ensued:

"[DEFENSE COUNSEL]: My inquiry would be why are we addressing the ailment before we are addressing the impasse. Because if there's an impasse the ill juror is done. They are all done. They all go home. We don't need them anymore. So I think we are doing it in reverse order. Because we have a jury now, and they have sent out a note saying they are hung on two counts and got a verdict on a third count. And so it would make sense to deal with that before we have to deal with any illness issues.

"THE COURT: Well, our jury is still deliberating. I have some reason to believe now that I may have a juror who is ill to the point that that juror is not able to perform their duties to deliberate. That obviously concerns me.

"[DEFENSE COUNSEL]: ...But what I am saying is I don't think they are deliberating anymore. The note says they are at an impasse. And so that would tell me they are hopelessly deadlocked in light of everything that's happened up until now, including the Court's admonition to them a few minutes ago. So I think we have a hung jury. So I am asking the Court to declare a mistrial if, in fact, they are still at that impasse that the juror mentioned a little while ago.

"The first note came out 1:40. It's now 3:30. And so, again, I don't think we need to address the issue of illness, and the affected juror there is going to be excused once a mistrial is taken and we take a verdict on the other count. So it wouldn't be more than 10 or 15 minutes and they will be out of here. Thank you.

"THE COURT: I appreciate your input. I will note that I have

asked the jurors to do further things in their deliberations, which would be to discuss among themselves how the Court might assist them in reaching a verdict if they can do so. If one of the 12 jurors is ill to the point that that juror is not able to meaningfully take part in those discussions, then I have a duty to decide if I have 12 functioning jurors."

Defense counsel also requested that the trial court ask the ill juror whether that juror was also the holdout juror, asserting the question "would be very relevant ... because the two could be linked. I mean, the person is feeling so much pressure to get out of there it's making them sick because they are getting pressure from other jurors, and it's just a good excuse to leave." The court denied counsel's request.

When the jury returned to the courtroom, the trial court ascertained that Juror No. 2 was the juror who was the subject of the jury's note. The court then examined Juror No. 2, outside the presence of the other jurors, as follows:

"Q. Ma'am, tell me what's going on with your state of condition or your physical or other condition.

"A. My asthma.

"Q. Your asthma?

"A. Yeah. And I lost my voice too.

"Q. Okay. When did you start suffering this adverse condition?

"A. When I got sick the week before we went on break. And I was out for the whole week. My doctor took me off.

"Q. All right.

"A. And then I started getting better. But now it's starting to get worse again, plus I lost my voice too.

"Q When did you first inform the foreperson in order for me to have this in the note. [¶] At some point you told the foreperson that you were feeling ill?

"A. Yes. [¶] ... [¶]

"Q. When did you first inform the foreperson that you were feeling ill?

"A. After — well, when we got back, when we got back the second time.

"Q. Was that this afternoon?

"A. Yes.

"Q. Well, the note that I am referring to now, the time is 3:08.

[¶] Was it after the last time you came out into court and I instructed all of you to try to think of some different things the Court might do to assist you?

"A. When I came back from lunch. And it's making me very tired too.

"Q. Okay. Now, has that been a problem until today? [¶] You have been deliberating since Monday afternoon?

"A. Correct.

"Q. Has your asthma condition been impairing your ability to function before today?

"A. Yes. It started getting worse again last night.

"Q. Okay. Now, if we were to recess now and come back tomorrow morning, do you think your condition would be improved?

"A. I can go see my doctor to see if she can give me something else.

"Q. Okay. Do you take medication for your condition?

"A. Yes.

"Q. And you don't have that medication available right now?

"A. I do have an inhaler. But as far as like antibiotics, they put me on steroids and everything. I have done all that, but nothing has helped. It seems like I am starting to have a relapse again.

"Q. When did you last see your doctor about this?

"A. The 26th, that Friday.

"Q. That would be February 26th?

"A. Yes.

"Q. Are you feeling some symptoms that you just feel you need to go home now?

"A. Yes, because I can hardly breathe.

"Q. Okay. And you don't have any medication or inhalers or things you can use now?

"A. I have an inhaler and everything. But I need some more medicine, basically.

"Q. If we recess now, do you think you would be able to get into see your doctor today?

"A. Yes.

"Q. Okay. Anything else you want to tell me about your condition, or is that pretty much it?

"A. Yes. It's just because I got sick."

After Juror No. 2 rejoined the other jurors in the jury room, Perkins's defense counsel renewed his request that the trial court inquire of Juror No. 2 whether she was "in the minority or the majority. Because I do think the two could be tied together. It's not unheard of that somebody might become ill if they are being pressured to vote a certain way and want to get out of here." Counsel added further: "And I would like the record to reflect that Juror No. 2 is Black and is the only Black juror that we have here."

After listening to these and other arguments from the attorneys, the trial court ruled as follows:

"...[W]hat I have a duty to do is first to safeguard the well-being of our jurors. I have a juror who just told me that she has a condition that has been with her some time, the asthma. She's been receiving medical care for it. And she is suffering some acute condition right now that's making it hard to breathe. And I am not going to put this juror in any further jeopardy or make her feel any worse than she is right now if I can be of assistance to her.

"So I am going to bring her back out by herself, instruct her that I want her to try to go see her doctor; that we are going to recess until tomorrow; that our goal is to have her continue on this jury, and I want to try to accommodate that by allowing her to receive the necessary medical care that she needs in order to fulfill her duties as a juror.

"We are just going to have to take it day by day. I will instruct her to come back tomorrow morning at nine o'clock, unless her doctor gives her some written instructions not to do so, and that if she cannot be here at nine o'clock tomorrow because of some instructions from her doctor then she is to contact the Court. And we will follow up from there the way we do anytime we have a juror that's sick.

"So I am not going to make any assumption about Juror No. 2 because of her race or ethnicity. I am not going to make any assumption that she is either the holdout or, you know, part of the 11 or part of the one. And I am going to treat her the same way I would any other juror who tells me that I am so sick I can't continue right now, I need to see my doctor. And I am not going to discriminate against her for any reason. And so I am going to bring her out, confirm my instructions, bring out the other 11, send them all home, order them back at nine o'clock."

The following morning (Friday, March 12, 2010), Juror No. 2

advised the trial court she had seen her doctor and had been given a steroid shot. She further advised that her doctor wanted her to stay home and rest that day, and provided the court with a doctor's note to that effect.

The court thereafter conferred with the attorneys and advised them that it planned to bring the jurors in and "just explain that the Court is going to let the jury have a recess today because of Juror No. 2's medical condition and we are going to come back Monday morning." The court then denied a request by Jones's attorney to ask the jurors "whether or not they are now at an impasse that they cannot move from." The court explained:

"Well, we made a record on this yesterday, and my finding yesterday was that I had instructed the jurors to discuss among themselves if there's anything the Court could do to assist them. After I gave them those suggestions and directions, I then found I had a juror that was not able to participate in the deliberations because of her physical and medical condition. And she told us all she was having trouble breathing. And I can't expect her to be functioning in a normal manner even to discuss things the Court might do to assist if she is back there struggling for breath. So I am going to deny your request."

After the jurors went into recess, the defense attorneys renewed their motion for a mistrial. The court denied the motion, observing:

"...[W]hat I told the jurors to do is to come back Monday morning, and at 9:00, to continue with their deliberations.

"I think I must say that when there are all 12 back in the jury room, they are deliberating. And in order to hopefully remove any suggestion that the Court was in any way trying to be coercive, I specifically reminded them that they are going to be asked to discuss among themselves the Court had suggested that they talk about to see if there's anything the Court can do to assist the jury.

"That was my way of trying to be inputting less pressure on any minority jurors in terms of voting because I am not telling them now you have to come back and reach a verdict. I am saying come back and continue deliberating, which is what jurors do when they are in the jury room, and also pointing out that I still expect them to discuss among themselves if there is anything the Court can do to assist them in reaching a verdict if they can do so. So I don't feel I have done anything that puts any coercive pressure on any juror."

The following Monday (March 15, 2010), the jury resumed deliberations at 9:22 a.m., after the court ascertained from Juror No. 2 that she felt well enough to perform her duties as a juror. The defense attorneys then raised a joint objection to the court's handling, the previous Thursday, of the jury's second note stating it was at an impasse. Defense counsel complained, "what your Honor did was basically disregard that note and send them back pursuant to your Honor's intention to continue with the jury deliberations." The court overruled the objection, noting:

"In response, I believe I addressed pretty much the same subject on Friday of last week. And my analysis of the situation was that we had a juror who was back in the jury room who informed me, after we received the note, that she was having trouble breathing. And I made a finding that she was not capable of deliberating in that physical and medical condition. And so I want to have 12 functioning jurors to be able to discuss the subjects that the Court raised with them before I take any further action as far as whether the jury is at an impasse."

At 11:05 a.m., the court received a note advising that the jury had reached a verdict. After the court received and reviewed the verdict forms, it called a recess of the jury in order to talk to the attorneys. The court then advised them that the verdicts and findings were incomplete, explaining "based upon the verdicts as to both the defendants, the jurors have failed to make certain findings as to whether allegations are true or not true."

Next, the trial court brought the jurors back in and advised them of the problem with the verdict forms and instructed them "to go back into the jury room, deliberate further as to those findings that are still unfilled by the jury.... There are certain findings that you have left blank, and it's your duty to deliberate and try to reach verdicts as to whether those findings are either true or not true."

The jury retired to continue deliberations at 11:50 a.m. At 12:01 p.m., the court ordered an adjournment for the jurors to take a lunch break. Deliberations resumed at 1:30 p.m. At 1:35 p.m. the court received a note stating, "We believe we have finished the paperwork."

The jury thereafter returned its verdict of guilty for all counts and returned true findings on all the special allegations. The trial court noted that the jury's true findings on the personal weapon discharge allegation (§ 12022.53, subd. (d)) for both appellants was inconsistent with the evidence that a single firearm was responsible for the fatal shot, and noted that it could later strike these allegations, which it ultimately did. Jones's attorney suggested the inconsistent findings were indicative jurors were coerced into rendering a verdict.

The trial court later denied appellants' joint motions for a new trial, which alleged that the court had coerced the jury's verdict on counts 1 and 2.

2. <u>Analysis</u>

Jones contends the trial court erred "by ignoring the jury's second statement of impasse and denying the defense mistrial motion; by refusing the defense request to question the ill juror as to whether she was the lone holdout in order to ascertain whether she was being subjected to undue pressure by her fellow jurors; and by instead simply ordering the jury to continue its deliberations on several occasions until the jury finally returned a guilty verdict." He concludes that "[t]he cumulative effect of the court's instructions was impermissibly coercive." We find these claims unpersuasive. The record demonstrates the trial court not only handled the situation properly, but went to great and commendable lengths to

ensure none of the jurors felt the court was pressuring him or her to arrive at a verdict if unable to do so.

"'The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or "unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."'" (People v. Neufer (1994) 30 Cal.App.4th 244, 254; People v. Breaux (1991) 1 Cal.4th 281, 318-319.) "'"The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency." [Citation.]'" (Neufer, supra, at p. 254; Breaux, supra, at p. 319.)

It is well-settled that sending the jury back to continue deliberations even after it has indicated a deadlock is generally proper. (See, e.g., People v. Pride (1992) 3 Cal.4th 195, 265-266 [trial court may instruct jurors who report a deadlock to continue deliberating if there is a reasonable probability they may be able to reach a verdict]; People v. Johnson (1992) 3 Cal.4th 1183, 1252-1254 [no coercion where trial court ordered jury to continue deliberations after it reported it was deadlocked 11-1]; People v. Gill (1997) 60 Cal.App.4th 743, 747-749 [trial court did not coerce verdict where it sent jury back to continue deliberating after jurors indicated 11-1 division].)

Under the foregoing authorities, it was not error for the trial court to ask the jury to continue deliberating after receiving the second note stating it was at an impasse. (See also People v. Rodriguez (1986) 42 Cal.3d 730, 774-777 [trial court did not err in requesting jury to continue deliberations despite its repeated declarations of an impasse, given complexity of trial evidence].) As respondent observes, and Jones does not refute, numerous state court decisions have held no coercion occurred in similar circumstances.[fn14]

**FN14**: While preserving the issues raised in his opening brief, Jones's reply brief does not revisit his claim that the trial court coerced the jury to return a verdict or any of his other claims concerning jury deliberations.

However, because the jury did not request any of the forms of assistance offered by the trial court in response to the jury's first note, Jones claims that "[o]bviously, the jury felt no further assistance by the court was necessary" and suggests the trial court should have declared a mistrial after its receipt of the jury's second note. We disagree. As the trial court explained each time it rejected this argument, which was made repeatedly by defense counsel below, the jury could not meaningfully avail itself of the court's offer of assistance where one of the jurors was demonstrably ill and unable to participate fully in deliberations. The court's explanation was reasonable and is supported by the record, which shows Juror No. 2, who suffered from asthma, was having difficulty breathing during the afternoon when the court received the jury's two notes. The record further shows Juror No. 2 was able to resume her duties as a juror after she received medical treatment and was given an opportunity to rest. On this record, the trial court did not abuse its discretion by implicitly concluding there was a reasonable probability of an agreement and

ordering the jury to continue deliberating after it received the jury's second note.[fn15]

**FN15**: We also reject Jones's suggestion that the timing of the verdict soon after the jurors resumed their deliberations the Monday after the three-day break, or the jury's initial failure to make findings on the special allegations and then its inconsistent findings on one of the firearm enhancements were evidence of coercion.

Jones also relies on Jiminez v. Myers (9th Cir. 1993) 40 F.3d 976 (Jiminez) to support his contention that the actions taken by the trial court were coercive. In Jiminez, after nearly five hours of deliberations, the jury stated it was unable to reach a verdict. The court inquired as to the number of votes taken and the results of the most recent vote. The foreperson responded that five or six votes had been taken and the most recent vote had a numerical division of 9 to 3. The judge then inquired as to whether there had been movement, and the foreperson said there had been movement in one direction. After a three-day weekend, the jury returned to its deliberations. Three hours later, the jury sent a note advising the court it was at an impasse. Both counsel agreed the jury was hung and the case should be set for retrial. However, the court inquired of the jury as to the numerical division and, upon learning it was 11 to 1, instructed the jurors to continue deliberating for the rest of the day. (Jiminez, supra, at pp. 978-979.)

In holding the trial court's action amounted to an improper Allen[fn16] charge, the Ninth Circuit concluded the trial court sent, "a clear message that the jurors in the majority were to hold their position and persuade a single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (Jiminez, supra, 40 F.3d at p. 981.) The Ninth Circuit reasoned the trial court's instruction was implicitly coercive to the single juror who had not moved in the court's favored position, and thus, the defendant did not have the benefit of an impartial and unanimous jury and fair trial. (Ibid.)

**FN16**: Allen v. United States (1896) 164 U.S. 492.

The decision in Jiminez is not binding on this court. (People v. Zapien (1993) 4 Cal.4th 929, 989.) Nor is it factually apposite. Here, the trial court's response to the jury's second note did not implicitly approve the jury's movement in one direction. After questioning Juror No. 2 about her health condition, the court made no remarks, either to Juror No. 2 or to the jury as a whole, which could be construed as encouraging any holdout juror to follow the majority. Moreover, when the court addressed the jury the following day, before ordering a recess to give Juror No. 2 a day (plus the weekend) to rest, the court reminded the jurors of its previous offer of assistance and suggested that, when they resumed deliberations on Monday, "to talk ... among yourselves to see if there is anything the Court can do to assist the jury in reaching verdicts *if you could do so*." (Italics added.) The record reflects the trial court deliberately added the qualifier if you can do so several times in its instructions to communicate to jurors, "If they can decide the case, that's fine. If they can't, that's fine too." The trial court's comments in this case are plainly different than those the Ninth Circuit condemned in Jiminez, supra, 40 F.3d 976. It bears repeating that the trial court in this case made a commendable effort to avoid making any coercive comments to the jury.

Finally, we reject Jones's contention that the trial court erred by denying defense counsel's request to question Juror No. 2 about whether she was a holdout juror and being pressured by the other jurors. The authority he cites in support of his contention, People v. Castorena (1996) 47 Cal.App.4th 1051 (Castorena), is inapposite. The court in Castorena held that the lower court prejudicially abused its discretion when it failed to conduct an adequate inquiry into allegations of juror misconduct where the trial court "did not have the requisite facts upon which to decide whether [the discharged juror] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the juror's] legitimate disagreement with the other jurors." (Castorena, supra, 47 Cal.App.4th at p. 1066.) Further inquiry was particularly important given that the discharged juror submitted a written response to the complaints of the other jurors. (Ibid.)

The circumstances here did not warrant further inquiry. Apart from the speculation of defense counsel, there was no evidence that Juror No. 2's reported illness and initial request to be excused was indicative of juror misconduct. When questioned by the trial court, Juror No. 2 made no statements suggesting either that she was a holdout juror or that her asthma was triggered or exacerbated by being unduly pressured to agree with the other jurors. Juror No. 2's answers revealed that her asthmatic condition had been present even before deliberations commenced, including during the week-long recess at the end of February, when she was not in the company of her fellow jurors. These circumstances, combined with Juror No. 2's expressed willingness to resume her duties as a juror once she received medical treatment, tend to contradict the theory advanced by the defense attorneys below that she was using or exaggerating her illness to try to avoid further pressure from the other jurors to join the majority vote. On this record, we believe the trial court wisely refrained from making "any assumption about Juror No. 2 because of her race or ethnicity" or "any assumption that she is either the holdout or, you know, part of the 11 or part of the one" and limited the scope of its questioning to her health condition.

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 65-91.

2.    Analysis

"Clearly established federal law provides that '[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.'" Parker v. Small, 665 F.3d 1143, 1147 (9th Cir. 2011) (quoting Lowenfield v. Phelps, 484 U.S. 231, 241, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988)). "A supplemental jury charge to encourage a deadlocked jury to try to reach a verdict is not coercive per se." Id. at 1147. When faced with a claim of jury coercion, a reviewing court must "consider the supplemental charge given by the trial court in its context and under all the circumstances." Lowenfield, 484 U.S. at 237 (citation and internal quotation marks omitted). The Ninth Circuit Court of

1  Appeals has identified several factors to assist a reviewing court in determining whether

2  a supplemental jury instruction of this kind violates due process: "(1) the form of the

3  instruction, (2) the time the jury deliberated after receiving the charge in relation to the

4  total time of deliberation, and (3) any other indicia of coerciveness." U.S. v. Berger, 473

5  F.3d 1080, 1090 (9th Cir. 2007), citing United States v. Steele, 298 F.3d 906, 911 (9th

6  Cir. 2002). The ultimate question is "whether the trial judge's inquiry would be likely to

7  coerce certain jurors into relinquishing their views in favor of reaching a unanimous

8  decision." Locks v. Sumner, 703 F.2d 403, 406 (9th Cir. 1983).

9      Petitioner argues that the cumulative effect of the trial judge's instruction was

10  coercive. Petitioner supports his arguments with the fact that the jurors did not avail

11  themselves to assistance after they announced they were deadlocked and indicated that

12  assistance could not help, that the trial court ignored the jury's second indication that it

13  was deadlocked, and that the judge failed to honor the defense counsels' requests to

14  poll the jury to determine if the holdout juror was facing undue coercion by the other

15  jurors and declare a mistrial.

16      As described by the state court, the trial judge was well-aware of his duty not to

17  coerce the jury. Further, the judge did not poll the jury regarding the number of jurors

18  voting for guilt or not, and politely instructed the jury at the first chance possible to review

19  the jury instructions and not to provide the court any further information beyond that the

20  jury was at an impasse.

21      When instructing the jury regarding proceeding past impasse, the trial court

22  provided the following cautionary statement that the court did not have a preference in

23  one verdict or another, that the court was not attempting to coerce the jury to make a

24  decision, and inquired if there was anything that the court could do to assist the jury in

25  making a decision "*if [they] can do so.*" (Rep. Tr. at 4143-45.) The trial court explained to

26  counsel that it added that language to the instruction which the trial court thought "makes

27  it even more clear that the court is not being coercive. If they can decide the case, that's

28  fine. If they can't, that's fine too." (Rep. Tr. at 4149.)

1    The trial court did not inquire to determine if the juror who was ill was the holdout

2  juror, and upon questioning, the ill juror stated no other reason rather than her medical

3  condition why she was not able to continue deliberating that day.

4    The state appellate court looked at the totality of the circumstances, and

5  evaluated the correctness of the law as stated in trial court's instructions. The instruction

6  did not single out the holdout juror and was a correct statement of the law. Even though

7  the trial court knew there was a holdout juror, the record shows that the supplemental

8  instruction did not single that juror out nor persuade her to change his mind. The

9  instruction only inquired whether there was anything the court could to assist the jury in

10  coming to decision, if the jurors could do so. Under the circumstances, with particular

11  emphasis paid to the content of the supplemental instruction, this Court cannot say that

12  the state court's conclusion was contrary to Parker or Lowenfield, or that it was

13  objectively unreasonable. See Parker, 665 F.3d at 1148 ("As long as the California Court

14  of Appeal reviewed all the facts, and considered the supplemental charge in its context

15  and under all the circumstances in holding that it was not coercive, then, in the absence

16  of Supreme Court authority to the contrary, this Court must give deference to the

17  California Court of Appeal's judgment.").

18    Accordingly, it is recommended that Petitioner is not entitled to relief for his first

19  claim.

20    **B.    Claim Two: Violation of Right to Open and Public Trial**

21    Petitioner contends that he was deprived of the right to a public and open trial

22  because the trial court ordered the audience to remain in the courtroom while the jury left

23  the building, thereby denying the defense an opportunity to question jurors.  (Pet. at 8.)

24    1.    State Court Decision

25    Petitioner presented his claim by way of direct appeal to the California Court of

26  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

27  Court of Appeal (People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735) and in a

28  subsequent petition for review filed with California Supreme Court. (Lodged Docs. 7-8.)

As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on this claim, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the public and open trial claim, the Court of Appeal said in its opinion:

### C. The Trial Court Did Not Violate Appellants' Right to a Public Trial

During the afternoon session on March 15, 2010, the trial court, observing the presence of a large group of spectators in the courtroom, admonished them that it would not tolerate any emotional displays when the verdict was read and advised "no persons in the courtroom, including the audience section, will be allowed to leave the courtroom until after the jurors have exited the court building." When Jones's counsel complained that the court was locking the courtroom doors and that it was "a public hearing and people have a right to be here," the court stated that the doors would be unlocked and advised the bailiff, "if anyone comes in while we are in session you can inform them they are to be seated, they are not to leave until the Court so instructs."

Jones now claims he was denied the constitutional right to a public trial when the court, for security purposes, required the audience to remain in the courtroom until the jurors left the courthouse. Because the public was not excluded from courtroom proceedings, this claim fails.

The Sixth Amendment of the United States Constitution guarantees the accused "a speedy and public trial." California Constitution also guarantees the "right to public trial of criminal cases." (People v. Esquibel (2008) 166 Cal.App.4th 539, 551, fn. 6.) "The observance of the right to a public trial precludes the closure of substantive courtroom proceedings in criminal cases." (Id. at p. 551.) Cases that have concluded a defendant was denied a public trial involved situations where the general public was entirely or substantially excluded from trial or pretrial proceedings. (See, e.g., Presley v. Georgia (2010) 130 S.Ct. 721 [public excluded from voir dire]; Waller v. Georgia (1984) 467 U.S. 39, 48-50 (Waller) [public excluded from suppression hearing]; People v. Byrnes (1948) 84 Cal.App.2d 72, 78-80 [entire trial].)

"'"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...."'" [Citations.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. [Citations.]" (Waller,

supra, 467 U.S. at p. 46, fn. omitted.)

None of these principles were violated in this case. As Jones acknowledges, the courtroom was not closed to the general public. The doors were left unlocked so spectators could still gain entrance and observe the proceedings. Spectators already in the courtroom were simply prevented from leaving until after the jurors had left the courthouse. We are unpersuaded by Jones's claim, which admittedly lacks direct supporting authority that the court's security measures implicated or impinged on his right to a public trial. Jones complains that "by detaining the audience until after the jury left, the court effectively prevented his investigator from inquiring into the jury impasse issue described above." Even assuming this is true, it does not establish Jones was denied his constitutional right to a public trial.[fn17]

FN17: Because we find the right to a public trial was not implicated here, we decline Jones's request to analyze the trial court's actions under the <u>Waller</u> test; i.e., "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." (Waller, supra, 467 U.S. at p. 48.)

<u>People v. Perkins</u>, 2012 Cal. App. Unpub. LEXIS 3735 at 91-94.

2.    Analysis

The Sixth Amendment guarantees a defendant the right to a public trial applicable to the states through the Fourteenth Amendment. <u>Presley v. Georgia</u>, 558 U.S. 209 (2010); <u>Waller v. Georgia</u>, 467 U.S. 39, 48, 49 n.9 (1984), <u>In re Oliver</u>, 333 U.S. 257, 273 (1948). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...." <u>Waller</u>, 467 U.S. at 46 (internal quotations and citations omitted). For this reason, before totally closing any part of a trial to the public,

[t]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

<u>Presley</u>, 130 S.Ct. at 724 (quoting <u>Waller</u>, 467 U.S. at 48); <u>see also</u> <u>Press Enterprise v. Superior Court of Cal.</u>, 464 U.S. 501, 510-11, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984);

1  but see United States v. Sherlock, 962 F.2d 1349, 1357 (9th Cir. 1992) (holding that

2  partial closures are subject to less stringent requirements than set forth in Waller).

3  Because a violation of the right to a public trial is structural error, no specific prejudice

4  need be shown in the case of a total closure. See Waller, 467 U.S. at 49-50. The right to

5  a public trial is not absolute, however, and must give way in some cases to other

6  interests essential to the fair administration of justice. See Id. at 45.

7        As Respondent asserts, at no time was the public excluded from the proceedings

8  in the courtroom. The courtroom remained open, and the public were both allowed in

9  and present during the verdict phase of trial. The audience was not allowed to leave the

10 courtroom until after the jurors exited the building. While this was clearly a restriction on

11 the physical movement of the public attending the trial, the state court reasonably

12 interpreted relevant federal law to find that the restriction did not violate Petitioner's right

13 to a public trial.

14       It is clear that relevant Supreme Court authority under Waller and Presley have

15 held that the Sixth Amendment right to a public trial extends beyond the actual proof at

16 trial, and includes certain pretrial hearings, and voir dire proceedings. See Presley, 558

17 U.S. at 212. In this case, the restriction occurred after a verdict was reached, and no

18 ongoing proceedings were occurring. Petitioner has not shown that a closure occurred

19 during his trial, or that his right to a public trial was other otherwise implicated. To the

20 extent that Petitioner's rights to question or poll members of the jury was violated,

21 Petitioner has not provided clearly established federal law in support of that claim.

22       For the above reasons, the state court's decision was not contrary to, or an

23 unreasonable application of, clearly established federal law or an unreasonable

24 determination of the facts at issue. Petitioner is not entitled to habeas relief with regard

25 to claim two.

26    **C.    Claim Three: Inadmissible Evidence**

27       Petitioner, in his third claim, contends that his right to a fair trial was violated when

28 the jury twice heard inadmissible evidence regarding a prior uncharged shooting incident

involving him. (Pet. at 9.)

1.    <u>State Court Decision</u>

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the Court of Appeal (<u>People v. Perkins</u>, 2012 Cal. App. Unpub. LEXIS 3735) and in a subsequent petition for review filed with California Supreme Court (Lodged Docs. 7-8.) As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  <u>Id.</u> at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the inadmissible evidence claim, the Court of Appeal said in its opinion:

C. References to Prior Shooting Incident Were Not Prejudicial

Perkins contends his federal constitutional right to a fair trial was violated when jurors heard, on two separate occasions, evidence informing them of his involvement in a shooting incident at a nightclub in the Tropicana Motel on December 20, 2004. We conclude the trial court did not abuse its discretion in concluding the gang expert's improper testimony on the subject was curable by admonition. We further conclude defense counsel did not render prejudicial ineffective assistance of counsel by failing to seek timely redaction of references to the Tropicana incident from Perkins's police interview, which the jury later heard during Detective Mark Charmley's testimony. We also reject Perkins's claim that the separate references to the incident were cumulatively prejudicial.

1. Background

During motions in limine, defense counsel for Perkins sought to limit the gang expert's expected testimony regarding Perkins's involvement in the Tropicana incident, which was one of the incidents on which the expert based his opinion that Perkins was a gang member. The trial court granted counsel's request "to limit the evidence to possession and firing of the firearm" but to "preclude the reference to a person actually being shot." However, when Ursery testified at trial, he described the Tropicana shooting incident as follows:

Officers responded to 1622 Union Avenue, which is the Tropicana Motel, with regards to a shots-fired call. Officers

located a victim who suffered a gunshot wound to his abdomen. Victim was identified as a security guard for the nightclub."

This testimony immediately led to an unreported sidebar conference. Afterwards, the trial court admonished the jury that the testimony was stricken and not to be considered for any purpose.

The trial court later stated on the record that, during the sidebar conference, it had denied the defense's motion for a mistrial and had also ruled to preclude the prosecutor "from eliciting any further testimony regarding that December 20th, 2004, incident ...." The court further stated: "[I]n considering your motion for mistrial, the Court does not find that Defendant Perkins has been denied a fair trial and that the interest of justice does not require that. The admonition, the Court is satisfied, resolved any prejudice."

The issue came up a second time prior to closing jury instructions. Defense counsel noted that Perkins had mentioned the Tropicana incident during his interview with Detective Charmley, a video-recording of which had been played to the jury a couple of weeks earlier. Counsel acknowledged, "I had forgotten that was actually in there and did not ask the Court before it was played to strike it." The trial Court thereafter granted defense counsel's request to strike Perkins's references to the Tropicana incident during his police interview and to admonish the jury accordingly.[fn7]

**FN7**: Specifically, the trial court granted defense counsel's motion to strike the following dialogue regarding the Tropicana incident from the transcript of Perkins's police interview: "Perkins [responding to a question about residency]: Bakersfield on and off for about five, four years, but I was locked up. [¶] Charmley: What for? [¶] Perkins: For, uh, self-defense. [¶] Charmley: Heh, heh, heh. [¶] Perkins: Heh, heh, heh. [¶] Charmley: Right on. [¶] Perkins: It was self defense. [¶] Charmley: Okay tell me about that. [¶] Charmley: Perkins: It was uh, I was at a club. [¶] Charmley: Which club were you at? [¶] Perkins: Uh, The Club Trop, Trop, Tropicana. [¶] Charmley: Uh huh. [¶] Perkins: And they had a club. [¶] Charmley: Uh huh. [¶] Perkins: On Sunday night. [¶] Charmley: Uh huh. [¶] Perkins: So these twins came to my house to come and pick me up. So I'm like—[¶] Charmley: Twin what? Girls? [¶] Perkins: Twin girls yeah. [¶] Charmley: [*45] Uh huh. [¶] Perkins: They come and pick me up. So they take me to this club. This is when I first came out here. [¶] Charmley: Uh huh. [¶] Perkins: And it's a gay club. So I'm (inaudible) [¶] Charmley: Nice. [¶] Perkins: ...man it's a gay club man, but it's all dudes and... [¶] Charmley: Uh huh. [¶] Perkins: ...like man you crazy. So I'm like, I got into it with one of the other dudes that's a girl because he was trying dance with me from behind. So I pushed him- [¶] Charmley: Heh, heh, heh. [¶] Perkins: Heh, heh. [¶] Charmley: All right. [¶] Perkins: So they pushed me out, I mean I got kicked out the club. [¶] Charmley: Uh huh. [¶] Perkins: So then I got into it with the uh the bouncers, like seven of 'em [¶] Charmley: Uh huh. [¶] Perkins: Seven, eight of 'em. So uh, one of my friends he had uh, he had a like a duce duce. [¶] Charmley: Uh huh. [¶] Perkins: What kind of gun is that? Little like- [¶] Charmley: Derringer. [¶] Perkins: Yeah Dillenger. [¶] Charmley: 22. [¶] Perkins: Yeah. [¶] Charmley: Uh huh. [¶] Perkins: And then we was all fighting and the gun was right there on the floor. We was all rumbling. [¶] Perkins: But I just discharged my uh parole. [¶] Charmley:

1
2
3

Right. Discharged from parole? [¶] Perkins: Yeah. [¶] Charmley: Who was your parole officer? [¶] Perkins: Richard Vierra. [¶] ... [¶] Charmley: When's the last time you had a gun? [¶] Perkins: The day I had got locked up. [¶] Charmley: Okay. [¶] Perkins: So I mean it's against parole to have a gun."

4

### 2. The Trial Court Properly Denied the Motion for Mistrial

5
6
7
8
9

A motion for mistrial should only be granted where an error causes prejudice which is incurable by admonition or instruction. (People v. Haskett (1982) 30 Cal.3d 841, 854.) The trial court has considerable discretion in determining whether an incident is incurably prejudicial. Thus, its ruling is reviewed under the deferential abuse of discretion standard. (People v. Hines (1997) 15 Cal.4th 997, 1038.) An abuse of discretion occurs when the trial court makes a ruling that is arbitrary, capricious, or exceeds the bounds of reason. (People v. Carbajal (1995) 10 Cal.4th 1114, 1121.)

10
11
12
13
14

The trial court acted well within its discretion in determining the gang expert's statements were not incurable error and by admonishing the jury to disregard them. Ursery's testimony concerning the Tropicana was very brief; only two sentences directly contravened the trial court's in limine ruling to prelude reference to a person actually being shot. As respondent correctly observes, Ursery did not attribute the shooting to Perkins or specifically discuss how Perkins was involved in the shooting. The mention of the Tropicana incident did not cause significant prejudice, and the court's admonition to the jury was sufficient.

15

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 41-47.

16

### 2.    Analysis

17
18
19
20

To the extent that Petitioner contends that prejudicial evidence of prior crimes was permitted under California state evidentiary law, his claim fails because habeas corpus will not lie to correct errors in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

21
22
23
24
25
26
27
28

With respect to Petitioner's due process claim, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair. Williams v. Taylor, 529 U.S. 362, 375, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). No Supreme Court precedent has made clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear

1    that a writ should be issued when constitutional errors have rendered the trial

2    fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or

3    overtly prejudicial evidence constitutes a due process violation sufficient to warrant

4    issuance of the writ." (citation omitted)).

5         Even assuming that improper admission of evidence under some circumstances

6    rises to the level of a due process violation warranting habeas corpus relief under

7    AEDPA, this is not such a case. Petitioner's claim would fail even under Ninth Circuit

8    precedent, pursuant to which an evidentiary ruling renders a trial so fundamentally unfair

9    as to violate due process only if "there are *no* permissible inferences the jury may draw

10   from the evidence." Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir 1998) (emphasis

11   in original) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)). See

12   also Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a

13   heavy burden in showing a due process violation based on an evidentiary decision.").

14   Here, the testimony was relevant to proving elements of the various gang enhancements

15   for which Petitioner was charged.

16        In any event, the admission of the challenged evidence did not deny petitioner a

17   fair trial. After a review of the record, this Court finds that the trial court's admission of

18   the testimony would not have had a "substantial and injurious effect" on the verdict.

19   Brecht, 507 U.S. at 623. See also Penry v. Johnson, 532 U.S. 782, 793-96, 121 S. Ct.

20   1910, 150 L. Ed. 2d 9 (2001). First, the trial court gave a limiting instruction regarding the

21   evidence and instructed the jury not to consider the evidence for any purpose.

22        Furthermore, as the state court noted, the statements regarding the prior shooting

23   were very brief, and the statements did not describe how Petitioner was involved in the

24   shooting. Finally, strong evidence proved that Petitioner and codefendant Anthony

25   Jones, members of the Eastside Crips, shot at and killed Deondre McGruder, a rival

26   Country Boy Crip gang member after words were exchanged and possibly in retaliation

27   for the recent murder of a fellow Eastside Crips gang member.

28

1    Based on the totality of the evidence including the brevity of the statements

2    regarding the earlier shooting, the admonition to the jury by the trial court, and strong

3    evidence presented at trial regarding the murder, there is no reasonable probability the

4    verdict would have been different if testimony was not presented. The California court's

5    rejection of the admission of prejudicial evidence claim was not contrary to nor an

6    unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). It is recommended that

7    Petitioner's third claim for relief be denied.

8           **D.    Claim Four: Ineffective Assistance of Counsel**

9    Petitioner, in his fourth claim, contends that his trial counsel was ineffective for

10   failing to seek timely redaction of Petitioner's statements to the police, which mentioned

11   the prior uncharged shooting at the Tropicana nightclub. (Pet. at 9.)

12          1.    State Court Decision

13   Petitioner presented his claim by way of direct appeal to the California Court of

14   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

15   Court of Appeal (People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735) and in a

16   subsequent petition for review filed with California Supreme Court. (Lodged Docs. 7-8.)

17   As stated earlier, "where there has been one reasoned state judgment rejecting a federal

18   claim, later unexplained orders upholding that judgment or rejecting the claim rest on the

19   same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to

20   as the "look through" presumption.  Id. at 804.  Since the Court of Appeal was the last

21   court to issue a reasoned opinion on these issues, this Court "looks through" the

22   California Supreme Court decision to the reasoned analysis of the Court of Appeal.

23          With regard to the ineffective assistance of counsel claim, the Court of Appeal

24   said in its opinion:

25          3. Ineffective Assistance of Counsel/Cumulative Prejudice Claims

26          Both the United States Constitution and the California Constitution
     afford a criminal defendant the right to effective assistance by trial

27   counsel. That right is denied if the attorney's performance fell below an
     objective standard of competence and there is a reasonable probability

28   that but for the attorney's errors or omissions, the outcome would have

been more favorable to the defendant. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. (Strickland v. Washington (1984) 466 U.S. 668, 687, 690, 697-698; People v. Ledesma (1987) 43 Cal.3d 171, 215, 217-218.)

The general rule is that where the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, a claim of ineffective assistance of counsel cannot be effectively litigated on direct appeal, and the issue must be raised by means of a petition for a writ of habeas corpus. (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266-267.) However, a reviewing court need not reach the issue of the attorney's competence if it can determine from the record that any arguable error or omission by counsel was not prejudicial. (Strickland v. Washington, supra, 466 U.S. at pp. 691-692; People v. Ledesma, supra, 43 Cal.3d at p. 217.)

In this case, we can determine from the record that there is no reasonable probability that Perkins would have been acquitted if defense counsel had moved to strike the references to the Tropicana incident before the jury heard Perkins's police interview. Perkins claims the court's order striking the references and admonishing the jury before jury instructions came too late to remove the prejudice caused by the jury's exposure to Perkins's police interview, particularly his statements informing Detective Charmley that he was "locked up" for "self-defense" in connection with the Tropicana incident. However, when viewed in context, these statements did not have the prejudicial effect Perkins attributes to them. During the relevant portion of his police interview, which we have quoted ante in footnote 7, Perkins did not mention that anyone actually got shot during the Tropicana incident (the subject addressed by the court's original in limine ruling) let alone that a gun was actually fired. Perkins described a fight with bouncers after he was kicked out of the nightclub. Perkins said his friend had a gun and that when he and his friends were fighting the bouncers "the gun was right there on the floor." Nothing in Perkins statements about the Tropicana incident during his police interview implied that he was convicted of a crime based on somebody being shot. Perkins theory that the jury's view of the case was incurably tainted during the weeks following its exposure to his police interview is simply not supported by the record.

We are also not persuaded by Perkins's claim of cumulative prejudice based on the jury's double exposure to Ursery's stricken testimony and Perkins's comments about the Tropicana incident in his police interview. Appellant's reliance on McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378 (McKinney) is misplaced. In McKinney, the Ninth Circuit held the admission of a large quantum of evidence (over 60 pages of testimony) about the defendant's fascination with knives was irrelevant to the issues at his trial for killing his mother with a knife and should not have been admitted. (McKinney, supra, 993 F.2d at pp. 1384-1385.) Because this inadmissible and irrelevant character evidence was "emotionally charged," the Ninth Circuit held that its admission rendered the trial fundamentally unfair thereby violating the defendant's federal constitutional right to a fair trial. (Ibid.) Not only was no curative admonition given, but the prosecutor emphasized the improper evidence in his closing argument. (Id. at p. 1386.)

McKinney is easily distinguished from the current case. A large

1
2
3
4
5
6

quantum of highly prejudicial character evidence was admitted at trial in McKinney and relied on by the prosecutor. Here, Ursery's improper testimony about the Tropicana shooting consisted of two brief sentences, with no specific reference to Perkins's involvement. The court struck the expert's testimony and gave a curative admonition. Perkins's own statements in his police interview were relatively brief and, as discussed above, did not specifically mention that a shooting occurred, let alone admit any personal involvement in the shooting. The court also struck Perkins's references to the Tropicana incident and gave the jury another curative admonition. On this record, we find neither Perkins's right to effective assistance of counsel nor his right to a fair trial was violated.

7

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 47-51.

8

2.      Law Applicable to Ineffective Assistance of Counsel Claims

9
10

The law governing ineffective assistance of counsel claims is clearly established

11

for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

12

Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).   In a petition for writ of habeas

13

corpus alleging ineffective assistance of counsel, the Court must consider two factors.

14

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

15

v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).   First, the petitioner must show that counsel's

16

performance was deficient, requiring a showing that counsel made errors so serious that

17

he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

18

Strickland, 466 U.S. at 687.   The petitioner must show that counsel's representation fell

19

below an objective standard of reasonableness, and must identify counsel's alleged acts

20

or omissions that were not the result of reasonable professional judgment considering

21

the circumstances.   Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

22

(9th Cir. 1995).   Judicial scrutiny of counsel's performance is highly deferential. A court

23

indulges a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance.   Strickland, 466 U.S. at 687; see also, Harrington v.

24

Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

25

Second, the petitioner must demonstrate that "there is a reasonable probability

26

that, but for counsel's unprofessional errors, the result ... would have been different."

27

Strickland, 466 U.S. at 694.   Petitioner must show that counsel's errors were "so serious

28

as to deprive defendant of a fair trial, a trial whose result is reliable."   Id. at 687.   The

1  Court must evaluate whether the entire trial was fundamentally unfair or unreliable

2  because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1348; United

3  States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

4        A court need not determine whether counsel's performance was deficient before

5  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

6  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any

7  deficiency that does not result in prejudice must necessarily fail.  However, there are

8  certain instances which are legally presumed to result in prejudice, e.g., where there has

9  been an actual or constructive denial of the assistance of counsel or where the State has

10  interfered with counsel's assistance.  Id. at 692; United States v. Cronic, 466 U.S., at

11  659, and n. 25 (1984).

12        As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the

13  standard for ineffective assistance of counsel in federal habeas is extremely difficult:

14            The pivotal question is whether the state court's application of the
   Strickland standard was unreasonable. This is different from asking
15   whether defense counsel's performance fell below Strickland's standard.
   Were that the inquiry, the analysis would be no different than if, for
16   example, this Court were adjudicating a Strickland claim on direct review
   of a criminal conviction in a United States district court. Under AEDPA,
17   though, it is a necessary premise that the two questions are different. For
   purposes of § 2254(d)(1), "an unreasonable application of federal law is
18   different from an incorrect application of federal law." Williams, supra, at
   410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a
19   deference and latitude that are not in operation when the case involves
   review under the Strickland standard itself.
20

21            A state court's determination that a claim lacks merit precludes
   federal habeas relief so long as "fairminded jurists could disagree" on the
22   correctness of the state court's decision. Yarborough v. Alvarado, 541
   U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this
23   Court has explained, "[E]valuating whether a rule application was
   unreasonable requires considering the rule's specificity. The more general
24   the rule, the more leeway courts have in reaching outcomes in case-by-
   case determinations." Ibid. "[I]t is not an unreasonable application of
25   clearly established Federal law for a state court to decline to apply a
   specific legal rule that has not been squarely established by this Court."
26   Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed.
   2d 251, 261 (2009) (internal quotation marks omitted).

27  Harrington v. Richter, 131 S. Ct. at 785-86.

28        "It bears repeating that even a strong case for relief does not mean the state

1  court's contrary conclusion was unreasonable." Id. at 786.  "As amended by AEDPA, §

2  2254(d) stops short of imposing a complete bar on federal court relitigation of claims

3  already rejected in state proceedings." Id. "As a condition for obtaining habeas corpus

4  from a federal court, a state prisoner must show that the state court's ruling on the claim

5  being presented in federal court was so lacking in justification that there was an error

6  well understood and comprehended in existing law beyond any possibility for fairminded

7  disagreement." Id. at 786-87.

8         Accordingly, even if Petitioner presents a strong case of ineffective assistance of

9  counsel, this Court may only grant relief if no fairminded jurist could agree on the

10  correctness of the state court decision.

11         3.    Analysis

12         The state court, in denying the claim, relied on finding that Petitioner did not

13  establish that he was prejudiced by the actions of counsel. The statements made by

14  Petitioner during the interview were provided in the state court decision and are included

15  in the section of state court opinion addressing claim three, above.

16         During his interview with law enforcement, Petitioner described how he was in an

17  altercation and kicked out of the Tropicana club, and that his friend's gun fell to the floor

18  during the fight. (7 Clerk's Tr. at 1930-1932.) Petitioner claimed he acted in self-defense

19  during the incident involving his friend and the club's bouncers, and there was never any

20  mention of anyone holding or firing the weapon. (Id.) Based on the evidence contained in

21  the statements, and specifically noting that the statements made by Petitioner about the

22  incident omitted any facts relating to shots being fired or whether Petitioner had any

23  involvement in the shooting, the state court found that Petitioner could not show that he

24  was prejudiced by the evidence or that the results of the trial would be different.

25         The court agrees. This evidence was neither critical to the prosecution's case nor

26  highly prejudicial to Petitioner. Petitioner's statements were brief, and while he implicated

27  himself in criminal activity, the testimony only described how his friend had a gun. But

28  Despite counsel's failure to strike the statements, the trial court gave a curative

1   instruction. (19 Rep. Tr. at 3834-3835, 3849.)

2       The potential prejudice from counsel's failure to request redaction prior to the tape

3   being played was mitigated by the Court's striking the Tropicana references and

4   admonishing the jury to disregard the evidence. The state court was also reasonable in

5   finding that there was no cumulative prejudice from the gang expert's mention of the

6   Tropicana incident because of the brief description provided in the statement, and that

7   there was no specific reference to Petitioner's involvement.

8       Petitioner has not met his burden of showing that but for counsel being ineffective,

9   there was a "reasonable probability that... the result ... would have been different."

10  Strickland, 466 U.S. at 694. The prosecution presented strong evidence of Petitioner's

11  guilt based on the evidence presented regarding the retaliatory shooting of a rival gang

12  member. As described by the state court, Petitioner's accomplice, Torino Jackson,

13  provided detailed testimony at trial regarding the confrontation and murder of the victim.

14  Jackson testified that he saw Petitioner exit the car and approach the victim. Upon

15  hearing gunshots, Jackson testified that the saw Petitioner pointing a gun at the victim.

16  He also testified that he hid Petitioner's gun at his house after the shooting.

17      Based on the strong evidence presented of Petitioner's involvement in the crime

18  of conviction, it is unlikely that jurors would have not found Petitioner guilty if his counsel

19  would have objected to peripheral testimony regarding other and lesser criminal activity

20  involving Petitioner. Fairminded jurists could therefore disagree with the correctness of

21  the state court decision that counsel's failure to object to the admission of the testimony

22  as not "so serious as to deprive defendant of a fair trial, a trial whose result is reliable."

23  Strickland, 466 U.S. at 687. Petitioner's claim of ineffective assistance of counsel is

24  without merit.

25      **E.    Claim Five: Failure to Corroborate Testimony of Accomplice**

26      Petitioner, in his fifth claim, contends that the prosecutor failed to present

27  evidence that corroborated the testimony of accomplice witness Torino Jackson as

28  required under California Penal Code § 1111. (Pet. at 13.) Petitioner contends that the

1  failure to comply with state law resulted in a violation of Petitioner's federal due process

2  rights. (Id.)

3                                1.    State Court Decision

4        Petitioner presented his claim by way of direct appeal to the California Court of

5  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

6  Court of Appeal (People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735) and in a

7  subsequent petition for review filed with California Supreme Court. (Lodged Docs. 7-8.)

8  As stated earlier, "where there has been one reasoned state judgment rejecting a federal

9  claim, later unexplained orders upholding that judgment or rejecting the claim rest on the

10  same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to

11  as the "look through" presumption. Id. at 804. Since the Court of Appeal was the last

12  court to issue a reasoned opinion on these issues, this Court "looks through" the

13  California Supreme Court decision to the reasoned analysis of the Court of Appeal.

14        With regard to the witness corroboration claim, the Court of Appeal said in its

15  opinion:

16  I. Sufficient Evidence Corroborated Accomplice Torino Jackson's
17  Testimony

18       We will begin by addressing Perkins's first contention on appeal, in
which he claims his convictions on counts 1 and 2 must be reversed
19  because the prosecution failed to present sufficient evidence to
corroborate the testimony of accomplice Torino Jackson as required by
section 1111, and without Jackson's testimony, the evidence was
20  insufficient to support the convictions. For reasons discussed below, we
disagree with this contention and conclude Jackson's testimony was
21  sufficiently corroborated.

22       A. Relevant authority

23       Section 1111 provides in pertinent part: "A conviction cannot be
had upon the testimony of an accomplice unless it be corroborated by
24  such other evidence as shall tend to connect the defendant with the
commission of the offense; and the corroboration is not sufficient if it
25  merely shows the commission of the offense or the circumstances
thereof." Thus, the testimony of an accomplice "has been legislatively
26  determined never to be sufficiently trustworthy to establish guilt beyond a
reasonable doubt unless corroborated." (People v. Tewksbury (1976) 15
27  Cal.3d 953, 967.)

28       "To corroborate the testimony of an accomplice, the prosecution

must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.]" (People v. Avila (2006) 38 Cal.4th 491, 562-563 (Avila).)

Adequate corroboration of an accomplice's testimony need not in itself be sufficient to convict the defendant; it may be slight and entitled to little consideration when standing alone. (People v. Rodrigues (1994) 8 Cal.4th 1060, 1128; People v. Douglas (1990) 50 Cal.3d 468, 507 (Douglas).) It need only "tend[] to connect the defendant with the crime so that the jury may be satisfied that the accomplice is telling the truth." (Douglas, supra, at p. 506, fn. omitted.) The corroborating evidence may be circumstantial and may consist of a defendant's conduct or statements. (Id. at p. 507.) It thus may be evidence that shows a consciousness of guilt. (People v. Hurd (1970) 5 Cal.App.3d 865, 875.)

The corroborating evidence must tend to connect the defendant to the crime, but it has to neither establish every element of the offense nor corroborate all of the accomplice's testimony. (People v. Heishman (1988) 45 Cal.3d 147, 164-165.) Although the corroborating evidence need only tend to connect the defendant to the crime, it must do more than raise a mere conjecture or suspicion of guilt. (People v. Szeto (1981) 29 Cal.3d 20, 27.) "[I]t is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.]" (People v. Falconer (1988) 201 Cal.App.3d 1540, 1543 (Falconer).)

"'A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice.'" (People v. Williams (1997) 16 Cal.4th 635, 680; accord, Avila, supra, 38 Cal.4th at p. 563 ["Defendant's initial attempt to conceal from the police his involvement in the activities culminating in the murders implied consciousness of guilt constituting corroborative evidence"].) False and contradictory statements of a defendant regarding the charge are material corroborating evidence. (People v. Santo (1954) 43 Cal.2d 319, 330; People v. Taylor (1924) 70 Cal.App. 239, 244; People v. McLean (1890) 84 Cal. 480, 481 [accomplice testimony sufficiently corroborated by evidence the defendant "made contradictory statements concerning his whereabouts on the night of the fire" and "took measures to get the accomplice to leave that part of the country"].)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' [Citations.]" (People v. Abilez (2007) 41 Cal.4th 472, 505; People v. McDermott (2002) 28 Cal.4th 946, 986; People v. Narvaez (2002) 104 Cal.App.4th 1295, 1303.)

B. Analysis

Jackson was an accomplice as a matter of law, and the jury was so instructed. The jury was also instructed on the type of evidence needed to corroborate his testimony. We conclude there was independent evidence

that tended to connect both appellants to the murder (count 1), and to connect Perkins to the firearm possession (count 2), to the degree that the jury reasonably could be satisfied that Jackson was testifying truthfully. (Douglas, supra, 50 Cal.3d at p. 506.)

Hendrix's testimony established that on the evening of the shooting (February 13, 2007), Perkins asked to borrow her red Ford Escort. After she gave Perkins the keys to the car, he left her apartment together with Jones and Jackson. The three men later returned to together around 9:42 p.m., close to the time Perkins had reportedly promised to return the car. According to Hendrix, all three men came into her apartment; appellants stayed in the living room while Jackson went back into the bathroom in her bedroom. The next morning, Hendrix found a firearm, along with a ski mask, under the couch in her living room. She had never seen any kind of gun before in her apartment. Hendrix arranged to return the gun to Jackson, who told her Perkins had left the gun there. In addition to this testimony, Hendrix told police that, as he was leaving her apartment after the shooting, Perkins asked Hendrix to return his gun to his uncle.

Hendrix further testified that "Glock .40" was printed on the gun she found under the living room couch. From the ballistics evidence, we know the main firearm involved in the shooting was a .40-caliber Glock semiautomatic pistol, and that all eight of the cartridge casings found at the scene were fired from the same weapon. Perkins suggests Hendrix's testimony about finding a gun under the couch was insufficient corroborating evidence because Jackson could have placed it there himself because, according to Hendrix's testimony, all three men came into her apartment when Perkins returned the keys to her car. However, even if the corroborating circumstances are consistent with the innocence of the accused, the determination as to whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact. (People v. Gallardo (1953) 41 Cal.2d 57, 63, fn.+ ; People v. Ruscoe (1976) 54 Cal.App.3d 1005, 1012.)

Further corroboration was provided by the following:

Leann Newman and Travon Stewart both observed a red car in the vicinity of where McGruder was walking and the residential street where the shooting occurred. Stewart positively identified the car he observed as Hendrix's red Ford Escort, the keys to which, as discussed above, Perkins obtained from Hendrix before leaving her apartment together with Jones and Jackson.

Paul Evans' testimony and police report, when viewed in the light most favorable to the judgment, placed Jones in the same neighborhood where the shooting occurred near the time of the shooting.

Moreover, the jury heard appellants' police interviews, in which they both lied about their whereabouts on the night of the shooting and claimed not to know Hendrix, a claim refuted by other evidence including phone records and Hendrix's testimony.

Considered together, the forgoing circumstances provided ample corroboration for Jackson's accomplice testimony under the legal authorities set forth above.[fn6]

1

2

3

4

**FN6**: We note that, above, we have found sufficient corroborating evidence existed as to both appellants, without reference to the evidence Perkins engaged in an attempt to dissuade Hendrix from testifying and tried to contact the Lelfore sisters and get Tasha Lelfore to testify that she picked him up from outside Hendrix's apartment complex on a different night than the night of the shooting. This evidence, which reflected Perkins's consciousness of guilt, constitutes additional corroboration for Jackson's testimony and helps support Perkins's convictions.

5

6

7

8

9

10

11

12

13

14

Perkins also asks us to compare the matter before us to cases in which convictions were reversed for lack of accomplice corroboration. (See People v. Robinson (1964) 61 Cal.2d 373, 398-399 [corroboration insufficient as to first degree murder where fingerprints on vehicle involved in crime showed defendant had been around vehicle on some recent date and defendant's stories to police conflicted on a minor point]; Falconer, supra, 201 Cal.App.3d at pp. 1542-1543 [corroboration insufficient as to attempted robbery of marijuana plants, where defendant was father of one of the perpetrators, visited the residence eight to nine months earlier, and knew the victim grew marijuana]; People v. Martinez (1982) 132 Cal.App.3d 119, 124, 133 [corroboration insufficient as to robbery where witness testifying defendant's complexion "exactly like" that of robber, where witness also testified, contrary to accomplice, robber had a beard, and other testimony from police officers related merely to "'the commission of the offense or the circumstances thereof,'" and did not connect defendant to the crime].) We have considered these cases and are not persuaded that any of them compels reversal of the judgment in this matter.

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 21-29.

15

16

      2.   Analysis

17

18

19

20

21

22

23

24

25

26

27

28

Petitioner claims his conviction cannot stand because it was supported by the uncorroborated testimony of accomplice Torino Jackson. In federal court "a conviction may be based on the uncorroborated testimony of an accomplice." United States v. Turner, 528 F.2d 143, 161 (9th Cir. 1975); see also Caminetti v. United States, 242 U.S. 470, 495, 37 S. Ct. 192, 61 L. Ed. 442 (1917) ("there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."); United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or insubstantial on its face"). California Penal Code § 1111, which requires corroboration of accomplice testimony, is a "state law requirement" which is "not required by the Constitution or federal law." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000). Petitioner's claim that uncorroborated accomplice testimony was improperly used to

1   support his conviction is based solely on a perceived error of state law and is therefore

2   not cognizable in this federal habeas corpus proceeding. Pulley v. Harris, 465 U.S. 37,

3   41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984) ("A federal court may not issue the writ on the

4   basis of a perceived error of state law.").

5       Because the testimony of Petitioner's co-defendant was neither incredible nor

6   insubstantial on its face, Petitioner is only entitled to habeas corpus relief if the state

7   court's alleged violation of state law denied him his due process right to fundamental

8   fairness. Laboa, 224 F.3d at 979. The evidence introduced at Petitioner's trial, including

9   the testimony of his accomplice, was sufficient to support his convictions. See Jackson v.

10  Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (there is sufficient

11  evidence to support a conviction if, "after viewing the evidence in the light most favorable

12  to the prosecution, any rational trier of fact could have found the essential elements of

13  the crime beyond a reasonable doubt.").

14      Further, "[a] State violates a criminal defendant's due process right to

15  fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement."

16  Laboa, 224 F.3d at 979 (citing Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S. Ct. 2227,

17  65 L. Ed. 2d 175 (1980)). State criminal procedures do not violate the Due Process

18  Clause unless they "offend[] some principle of justice so rooted in the traditions and

19  conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518

20  U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996). The California Court of Appeal

21  carefully reviewed the evidence and determined that, under state law, sufficient evidence

22  corroborated the accomplice testimony. This determination by the Court of Appeal is

23  supported by the facts of this case and does not constitute an arbitrary denial of a state

24  law entitlement. Further, the court's ruling does not offend any fundamental principle of

25  justice or render Petitioner's trial fundamentally unfair. Petitioner is not entitled to relief

26  on his claim that there was insufficient evidence based on the lack of corroboration of

27  accomplice testimony to support his conviction.

28      **F.    Claim Six: Bifurcation of Gang Enhancements**

Petitioner, in his sixth claim, contends that the trial court erred by denying his motion to bifurcate the trial with regard to the gang enhancements. (Pet. at 17.)

### 1.  State Court Decision

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the Court of Appeal (People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735) and in a subsequent petition for review filed with California Supreme Court. (Lodged Docs. 7-8.) As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the bifurcation claim, the Court of Appeal said in its opinion:

II. Gang-Related Issues

> … Perkins claims: (1) the trial court erred in refusing to bifurcate trial of the gang allegations… We disagree with [this] claim[].

A. Additional Factual Background

> In his testimony, the main gang expert, Kyle Ursery, described his familiarity with the Eastside Crips gang in Kern County and explained its main rivals were the Country Boy Crips, Westside Crips, and Bloods gangs. Gang rivalry expressed itself in activities ranging from shootings in public facilities to assaults and robberies.

> Ursery was aware of specific cases of shootings between the members of the Eastside Crips and Country Boy Crips gangs. One such case occurred in July 2005, around 1:00 a.m., at a Citgo gas station. The victim, Damon Moore, was found sitting in the passenger's seat of his car with a gunshot wound to his head. Witnesses reported that they had seen Ted Blackmon approach Moore and say, "I see you baby," in regards to Moore's wearing a powder blue T-shirt, which is the traditional color of the Country Boy Crips. Blackmon misfired one time but was able to strike Moore on the second squeeze of the trigger. Blackmon was identified by witnesses in a photo lineup and later convicted by jury of murder with gang enhancements.

> 1. Ursery's Opinion that Appellants were Active Gang Members

1
2
3

In reaching his opinion that appellants were active members of the East Side Crips gang, Ursery reviewed a variety of sources of information, including general offense reports and the current offense report, street checks, booking information, and tattoo information.

4

In support of his opinion that Perkins was an active East Side Crips gang member, Ursery relied on the following information:

5
6

When Perkins was booked into jail on February 25, 2007, in connection with the instant charges, he claimed to be a Crip and requested to be kept away from Bloods.

7
8

On June 23, 2004, Perkins was in the company of four other members of the Eastside Crips gang.

9
10
11

On April 29, 2004, security staff of a Wal-Mart store advised police that Perkins and William Leonard, a known member of the Eastside Crips gang, had taken some items from the store and then struggled with security. Perkins, who was detained in the parking lot, was identified by his moniker "Wheezy." Perkins and Leonard were arrested for petty theft.

12
13
14

On April 10, 2004, officers contacted Leonard, who was the victim of gunshot wound, at Kern Medical Center. Perkins was with Leonard. Leonard was apparently the victim of a shooting incident at the La Movida nightclub, which was a known Eastside Crip hangout and located within the traditional territory of the Eastside Crips gang. Leonard and Perkins were uncooperative and did not provide officers with any information.

15
16

On April 5, 2003, Perkins and Leonard were involved in a fight at a shopping mall.

17

In the current case, Hendrix reported that Perkins told her he was a former member of the Grape Street Crips gang.

18
19
20
21
22

Ursery testified he was familiar with the Grape Street Crips, and personally involved in 10 investigations locally involving Grape Street Crips gang members. He also had experience patrolling in the Watts area of Los Angeles, spoken with gang experts who handle Grape Street Crips, reviewed Internet reports, and spoken with several members of the Grape Street Crips. Ursery's understanding was that the Grape Street Crips is a criminal street gang in the Los Angeles area, and that the Grape Street Crips have ties to the Eastside Crips in Kern County. Ursery explained:

23
24
25
26

"In the mid-'70s, about anywhere from 20 to 30 members of a clique down in Watts Los Angeles, known as Sponnie G Watts, a subset of the Grape Street Crips, moved north to Bakersfield and took residency in the traditional boundaries of the Eastside Crips now, which is east of Union. There they met up with a couple of local dance crews which then formed into the entire Eastside Crips criminal street gang."

27

An Eastside Crips gang member, Davion Colen, identified Perkins as a member of the gang during a police interview.

28

In a recorded phone conversation, Ursery heard Perkins say, "East

up." Ursery had heard other admitted members of the Eastside Crips gang use this phrase to acknowledge their gang status.

Finally, Ursery relied on a letter that was located in Perkins jail cell, where he was in custody on the instant charges. The letter contained the following rap lyrics: "Eastside, where I'm from. Grape Street Watts. Watts up. You know me. I'm from Grape Street. So I am Baby loc Cripin. I wipe them Flee Jays off me." Ursery testified: "I know from my training and experience Baby loc is a subset located within the Grape Street Crips criminal street gang." On redirect examination, Ursery testified the letter found in Perkins's cell also included the following lyrics: "Man, if I kill a nigga let me get caught by mysef. I don't need a nigga snitching on me, givin the police help."

In support of his opinion that Jones was an active East Side Crips gang member, Ursery relied on the following information:

On February 27, 2007, when Jones was booked into jail, he claimed Eastside Crips and asked to be kept away from Bloods and north.

On February 8, 2008, officers in the gang unit, including Ursery, interviewed Eastside Crips gang member Isaiah Hodges in connection with a robbery investigation. Hodges identified Jones as a member of the Eastside Crips gang and referred to Jones by his moniker, "Amp."

On February 14, 2007, Jones was contacted during a traffic stop. During casual conversation with officers, Jones admitted membership in the Eastside Crips gang.

On December 12, 2005, officers responded to the 2200 block of White Lane regarding an assault with a deadly weapon involving a knife. During the investigation, officers contacted Jones and Eastside Crips gang member, Davion Colen, who also identified Jones as a member of the gang.

On March 7, 2005, officers responded to an address on Banjo Court, regarding a peace disturbance. There they contacted Jones in the presence of John Cherry and Bryson Cherry, both of whom are known members of the Eastside Crips gang.

On November 16, 2004, officers responded to an address on Dina Way, regarding a residential burglary. Jones and Bryson Cherry were arrested for burglary and conspiracy. Later that day, John Cherry threatened a witness to the burglary and was later arrested for intimidating a witness.

2. Ursery's Opinion about the Victim's Gang Affiliation

Ursery was of the opinion that McGruder was affiliated with the Country Boy Crips. During one jail booking in 2002 and one in 2001, McGruder claimed Country Boy Crips and asked to be kept away from Bloods.

B. Trial Court Did Not Err in Denying Bifurcation Motion

Perkins contends the trial court abused its discretion and violated

48

his federal constitutional due process rights by denying his pretrial motion to bifurcate the gang enhancement and gang special circumstance allegations. We disagree.

In People v. Hernandez (2004) 33 Cal.4th 1040 (Hernandez), the California Supreme Court held that a trial court has discretion to bifurcate trial on a gang enhancement, and that "the trial court's discretion to deny bifurcation of a charged gang enhancement is ... broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (Id. at p. 1050.) The court cautioned that bifurcation will sometimes be appropriate:

> "The predicate offenses offered to establish a 'pattern of gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (Hernandez, at p. 1049.) On the other hand, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.] [¶] Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself — for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged — a court may still deny bifurcation." (Hernandez, at pp. 1049-1050.)

Hernandez concerned a robbery during which one of the defendants said the victim was dealing with "'Hawthorne Little Watts,'" which the victim suspected was a gang. (Hernandez, supra, 33 Cal.4th at p. 1045.) The high court found no abuse of discretion in the trial court's denial of bifurcation, noting: "Much of the gang evidence here was relevant to the charged offense. Indeed, defendant Hernandez himself injected his gang status into the crime. He identified himself as a gang member and attempted to use that status in demanding money from the victim.... Detective Goetz's expert testimony helped the jury understand the significance of Hernandez's announcement of his gang affiliation, which was relevant to motive and the use of fear." (Id. at pp. 1050-1051.)

In the present case, gang enmity was the sole motive for an otherwise senseless killing from the prosecution's standpoint. "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] '"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in

admitting evidence of its existence." [Citations.]' [Citations.]" (People v. Samaniego (2009) 172 Cal.App.4th 1148, 1167-1168.)

Expert testimony on gangs, especially the rivalry between the Eastside Crips and Country Boy Crips, helped the jury here understand the prosecution's theory of why the homicide occurred. "Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [appellant's] actual guilt." (Hernandez, supra, 33 Cal.4th at p. 1051.) Accordingly, the trial court did not abuse its discretion by denying Perkins's request for bifurcation of the gang allegations. Nor has he demonstrated that a joint trial of the substantive charges and gang allegations "'actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (People v. Mendoza (2000) 24 Cal.4th 130, 162.)

People v. Albarran (2007) 149 Cal.App.4th 214, on which Perkins relies, is distinguishable. On the facts of that case, the Court of Appeal concluded that the erroneous admission of gang evidence violated due process. (Id. at p. 232.) There, however, "the motive for the underlying crimes ... was not apparent from the circumstances of the crime." (Id. at p. 227.) Nothing inherent in the facts of the shooting suggested any specific gang motive; the only evidence to support the prosecution's claimed motive that the shooting was to gain respect, was the fact of the defendant's gang affiliation. (Ibid.) This was insufficient to counterbalance the "other extremely inflammatory gang evidence [that] was admitted, which had no connection to these crimes." (Ibid.) In short, much of the gang evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (Id. at p. 228.)

To support his analogy of the instant case to Albarran, Perkins specifically cites to the gang expert's testimony regarding the 2005 shooting death of a Country Boy Crip (Damon Moore) by an Eastside Crip (Ted Blackmon), arguing it had "little or no relevance to issues surrounding the charged homicide" and was "extremely prejudicial." We disagree and find the evidence, which helped demonstrate the rivalry between appellants' gang and the victim's perceived gang, was relevant to the disputed issues at trial. Moreover, the evidence was not so prejudicial that the jury might have been swayed to convict Perkins regardless of his actual guilt. The 2005 shooting incident, which involved neither Perkins nor Jones, was no more inflammatory than the evidence of the charged offenses. The evidence presented here was quantitatively and qualitatively different from that before the court in Albarran.

Finally, as Perkins candidly acknowledges, shortly after the gang expert testified regarding the 2005 shooting incident, the trial court gave the jury an instruction on the limited purpose of gang evidence as follows:

"All right. Ladies and gentlemen of the jury, I am going to interrupt the witness's testimony to give you a further instruction on the law. This is also an instruction that I will be giving you at the end of all the evidence.

"Evidence in this case may be introduced for the purpose of showing criminal street gang activities and of criminal acts

1
2
3

by gang members other than the crimes for which these two defendants are on trial. This evidence, if believed, may not be considered by you to prove that a defendant is a person of bad character or that he has a disposition to commit crimes.

4
5
6

"It may be considered by you only for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.

7
8

"For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case."

9
10

We presume the jury followed this instruction (People v. Yeoman (2003) 31 Cal.4th 93, 139).

11

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 29-41.

12

2.    Analysis

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The United States Supreme Court has not determined that a criminal defendant has a federal constitutional right to bifurcation. See Spencer v. Texas, 385 U.S. 554, 565-66, 87 S. Ct. 648, 17 L. Ed. 2d 606 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); Marshall v. Lonberger, 459 U.S. 422, 438 n.6, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) (reaffirming Spencer). Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. Zafiro v. United States, 506 U.S. 534, 538-39, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal quotation marks and citation omitted).

1    Petitioner bears the burden of proving that he is entitled to federal habeas relief,

2    Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2003), and must establish that prejudice

3    arising from the failure to grant a severance was so "clear, manifest, and undue" that he

4    was denied a fair trial. Lambright v. Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999)

5    (quoting United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996)). "In

6    evaluating prejudice, the [federal habeas court] focuses particularly on cross-

7    admissibility of evidence and the danger of 'spillover' from one charge to another,

8    especially where one charge or set of charges is weaker than another." Davis, 384 F.3d

9    at 638. Undue prejudice also exists "whenever joinder of counts allows evidence of other

10   crimes to be introduced in a trial where the evidence would otherwise be inadmissible."

11   Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

12   On habeas review, federal courts neither depend on the state law governing

13   severance, Grisby, 130 F.3d at 370 (citing Hollins v. Dep't of Corrections, State of Iowa,

14   969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance given

15   to criminal defendants in the federal criminal justice system. Id. Rather, the relevant

16   question is whether the state proceedings satisfied due process. Id.; see also Cooper v.

17   McGrath, 314 F. Supp. 2d 967, 983 (N.D. Cal. 2004).[1]

18   As the California Court of Appeal correctly observed, this case involved

19   defendants who committed crimes motivated by the defendant's participation in a

20   criminal street gang. The evidence produced at trial regarding the gang enhancements

21   was admissible[2] and relevant to the other charged crimes. This reduced the possibility of

22   prejudice to Petitioner. Under the circumstances of this case, Petitioner has not

23   established that the state trial court's refusal to bifurcate the gang enhancement charges

24

25   [1] To the extent petitioner is arguing that the trial court abused its discretion under state law in denying his request for bifurcation, his claim is not cognizable in these federal habeas proceedings. Estelle, 502 U.S. at 67-68.

26

27   [2] To the extent petitioner claims that the presentation of the gang expert's testimony was prejudicial, and violated his due process rights, the claim is denied for the same reasons as Petitioner's claim that he was prejudiced by the presentation of the testimony regarding the prior criminal incident at the nightclub. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

28

at trial rendered his trial fundamentally unfair. <u>Davis</u>, 384 F.3d at 638. Federal habeas relief is not warranted on this claim.

### G.    Claim Seven: Right to be Present During Read Back of Testimony

Petitioner, in his last claim, contends that his right to be present at all critical stages of trial was violated when he was denied the right to be personally present during the read back of testimony to the deliberating jury. (Pet. at 17-18.)

#### 1.    State Court Decision

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the Court of Appeal (<u>People v. Perkins</u>, 2012 Cal. App. Unpub. LEXIS 3735) and in a subsequent petition for review filed with California Supreme Court. (Lodged Docs. 7-8.) As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  <u>Id.</u> at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the read back claim, the Court of Appeal said in its opinion:

A. The Reading of Testimony Was Not a "Critical Stage" of the Proceedings

During deliberations, the jury asked for portions of the testimony given by Travon Stewart, Torino Jackson, and Leann Newman to be read back. The trial court denied a request by Perkins's defense counsel to have the testimony read in open court. Perkins now contends the denial of this request violated his constitutional right to be present during a critical stage of the proceedings.

The right of a defendant to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure" is guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution. (<u>Kentucky v. Stincer</u> (1987) 482 U.S. 730, 745.) The issue is whether the court reporter's reading of testimony to the jury is a critical stage of the proceedings at which the defendant's presence would contribute to the fairness of the trial.

As Perkins recognizes, in People v. McCoy (2005) 133 Cal.App.4th 974, this court held that reading of testimony to the jury by the court reporter is not a critical stage of the proceedings. Our holding was premised on a lack of any authority from the United States Supreme Court suggesting that a court reporter reading testimony to the jury is a critical stage of the proceedings and California Supreme Court authority suggesting that such proceedings were not a critical stage of the proceedings. For example, in People v. Horton (1995) 11 Cal.4th 1068, in rejecting the defendant's claim that error occurred because he did not personally waive the right to be present when the court reporter read testimony to the jury, the California Supreme Court stated, "The reading back of testimony ordinarily is not an event that bears a substantial relation to the defendant's opportunity to defend [citations], and nothing in the present record indicates that defendant's personal presence would have assisted the defense in any way." (Id. at p. 1121.)

In response to this authority, Perkins cites three cases decided by the Ninth Circuit Court of Appeals, Turner v. Marshall (9th Cir. 1995) 63 F.3d 807, 815,[fn11] United States v. Kupau (9th Cir. 1986) 781 F.2d 740, 742, 743, and Bustamante v. Eyman (9th Cir. 1972) 456 F.2d 269, 274. [fn12] Only Turner addressed the issue before this court, and we are not persuaded by its reasoning. Moreover, even the Ninth Circuit has acknowledged that the United States Supreme Court has not recognized such a right, nor have other jurisdictions. (La Crosse v. Kernan (9th Cir. 2001) 244 F.3d 702, 707-708.) Therefore, even if we were not bound by the decisions of the California Supreme Court, which we are (Auto Equity Sales, supra, 57 Cal.2d at p. 455), we would reject Perkins's argument.

**FN11**: Overruled on other grounds in Tolbert v. Page (1999) 182 F.3d 677, 685.

**FN12**: Overruled in Campbell v. Wood (9th Cir. 1994) 18 F.3d 662, 672.

People v. Perkins, 2012 Cal. App. Unpub. LEXIS 3735 at 62-65.

2.   Analysis

Even where the accused is not confronting witnesses or evidence against him, the Due Process Clause guarantees a criminal defendant the right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987). A defendant's presence contributes to the fairness of a procedure when, in light of the nature of the situation, defendant's presence would be useful in ensuring a more reliable determination. Id. at 747. The right is fundamental. Rushen v. Spain, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

1    However, the Supreme Court has never held that reading back testimony to a jury

2    is a critical stage of the trial at which an accused has a right to be present. See La

3    Crosse v. Kernan, 244 F.3d 702, 707-708 (9th Cir. 2001) (holding that because the

4    Supreme Court had never addressed either the question of whether the right to be

5    present attached to a reading back of testimony or a case involving a materially

6    indistinguishable set of facts, a state court decision denying relief could not be contrary

7    to, or an unreasonable application of, clearly established federal law). An unreasonable

8    application of clearly established federal law under § 2254(d)(1) cannot be premised on

9    an unreasonable failure to extend a governing legal principle to a new context where it

10   should control. White v. Woodall,      U.S.    , 134 S.Ct. 1697, 1706, 188 L. Ed. 2d 698

11   (2014). Therefore, "'if a habeas court must extend a rationale before it can apply to the

12   facts at hand,' then by definition the rationale was not 'clearly established at the time of

13   the state-court decision.'" Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666, 124 S.

14   Ct. 2140, 158 L. Ed. 2d 938 (2004)). In view of the Ninth Circuit authority of Lacrosse v.

15   Kernan, it cannot be said that it is so obvious that the right to be present applies to the

16   procedure of reading back testimony that there could be no fairminded disagreement on

17   the question. See White v. Woodall, 134 S.Ct. at 1706-07.

18   Even assuming Petitioner suffered a violation of the right to be present, the error's

19   harmlessness would warrant denial of Petitioner's claim. The Supreme Court has not

20   held that absence of a defendant from a critical stage of the trial is a structural error;

21   rather, "unless the deprivation, by its very nature, cannot be harmless," a violation of the

22   right to be present may be harmless error. Campbell v. Rice, 408 F.3d 1166, 1172 (9th

23   Cir. 2005) (en banc) (quoting Rushen v. Spain, 464 U.S. at 117 n.2 (1983) (per curiam)

24   (finding harmless an ex parte communication between the trial judge and a juror

25   regarding forgotten voir dire information)); Fisher v. Roe, 263 F.3d 906, 917-18 (9th Cir.

26   2001) (concluding that reading back testimony without the knowledge or presence of the

27   defendant or defense counsel was a violation of the right to be present, finding prejudice

28   under Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353

1  (1993), and distinguishing <u>Lacrosse v. Kernan</u> on its facts); <u>Turner v. Marshall</u>, 121 F.3d

2  1248, 1255 (9th Cir. 1997) (finding harmless defendant's absence from the jury room

3  during the reading back of testimony because there were no circumstances suggesting

4  any irregularity or actual prejudice, and strong circumstantial evidence connected the

5  defendant to the crime).

6       Here, there is no indication that any problem arose while the testimony was being

7  read back that affected the verdict or the fairness of the proceedings. Multiple sources of

8  direct and circumstantial evidence supported the guilty verdict. Accordingly, the result of

9  any alleged error was harmless. It is recommended that the Court deny Petitioner's claim

10  of a violation of the right to be present during the read back of testimony to the jury.

11  **IV.**   **RECOMMENDATION**

12       Accordingly, it is hereby recommended that the petition for writ of habeas corpus

13  be DENIED with prejudice.

14       This Findings and Recommendation is submitted to the assigned District Judge,

15  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after

16  being served with the Findings and Recommendation, any party may file written

17  objections with the Court and serve a copy on all parties.  Such a document should be

18  captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply

19  to the objections shall be served and filed within fourteen (14) days after service of the

20  objections.  The parties are advised that failure to file objections within the specified time

21  may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d

22  834, 839 (9th Cir. 2014).

23

24  IT IS SO ORDERED.

25     Dated:   __May 28, 2015__        ____ /s/ *Michael J. Seng*

26                             UNITED STATES MAGISTRATE JUDGE

27

28